# United States Tax Court

T.C. Memo. 2025-123

LAKE JORDAN HOLDINGS, LLC, LAKE JORDAN PARTNERS,
LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 16532-21.                    Filed November 25, 2025.

————

*John W. Hackney*, *John J. Nail*, *Jeffrey S. Luechtefeld*, *Samuel H. Grier*, *Hale E. Sheppard*, and *Gabriella K. Cole*, for petitioner.

*Vassiliki Economides Farrior*, *Jeannette D. Pappas*, *Charles F. Rioux*, *Abigail F. Dunnigan*, and *Dillon T. Haskell*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

URDA, *Chief Judge*: Once again in the conservation easement context, we return to the old question: "Who you gonna believe, me or your lyin' eyes?" Lake Jordan Holdings, LLC (Holdings), claimed a charitable contribution deduction of $12,740,000 on its 2017 tax return for the donation of a conservation easement over 157 acres of rural property in Elmore County, Alabama (easement property). Outside the current environment, this value would be truly remarkable. A 96% stake in Holdings, whose only asset was 165 acres of land—the easement property and eight adjacent acres of odds and ends—had cost $583,000 a few months before. In conservation easement world, however, it is just another day at the office.

With our eyes fixed on the objective evidence before us, we see the conservation easement here as yet another in the depressingly long line

**Served 11/25/25**

[*2] of cash grabs dressed up in eleemosynary clothing. Although we conclude that Holdings satisfies the requirements for claiming a charitable contribution deduction, the value claimed was egregious. Holdings' charitable contribution was worth $1,091,760, not $12,740,000, and it richly merits the 40% gross misstatement penalty, *see* I.R.C. § 6662(a), (h),[1] that accompanies such grasping positions.

## FINDINGS OF FACT

The following facts are derived from the pleadings, the stipulations of facts with attached exhibits, and the evidence admitted at trial. Holdings is a Georgia limited liability company (LLC) and classified as a TEFRA partnership at all relevant times.[2] Holdings' principal place of business was in Georgia at all times relevant to this case. Petitioner, Lake Jordan Partners, LLC (Partners), was Holdings' tax matters partner.

I. *The Easement Property*

A. *The Neighborhood*

The easement property lies in a very rural area in the northwest corner of Elmore County. The nearest town, Titus, is little more than a "crossroads with a stop sign," as one of Partners' experts put it. The closest town of any size, Wetumpka, sits 14 miles away from the easement property, with even the nearest gas station six miles distant.

The easement property is nestled in the Coosa River Basin, a significant "freshwater biodiversity hotspot[]," and "one of the most imperiled by pollution, dams, and other anthropogenic factors," as noted by one of the Commissioner's experts. During the last century, Alabama Power erected seven dams on the Coosa River, which formed six lakes, including Lake Mitchell, Lay Lake, and Lake Jordan. The easement property sits on the northeast side of Lake Jordan, near where the river begins to widen into the lake, with the lake's main body approximately

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[2] Before its repeal the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit procedures for many partnerships, including Holdings.

[*3] four miles away.  The easement property includes water frontage of approximately 4,000 feet.



Town Creek, a 30-foot-wide permanent stream, lies along the north end of the easement property.  Given the proximity to Town Creek and Lake Jordan, parts of the easement property are located within a high-risk flood zone.  The 165 acres on which the easement property sits do not include a boat ramp or launch.  An offsite public boat ramp, however, is accessible using a nearby public road.

The easement property features sloping terrain that ranges from slight to moderate but also includes some areas of steep slope and rolling hills.  As one of the Commissioner's experts observed: "Lake Jordan was formed by damming the Coosa River, so the property which adjoins the river has a steeper topography than the property located further away from the river."  One Elmore County realtor noted that the steep topography might require a developer "to bring in someone from Gatlinburg that knows how to construct buildings on the side of a

[*4] mountain." As of the time of the granting of the easement, the easement property had no utilities.

The easement property's location on the northeast side of Lake Jordan presents some accessibility challenges. The closest crossings to access the easement property from the west side of the Coosa River are 12 miles to the north or 14 miles to the south. Properties, like the easement property, on the northern and eastern sides of Lake Jordan are also more remote from both Montgomery and Birmingham than properties on the western and southern sides on account of the layout of the roads in the area.

The easement property is in an unincorporated area of Elmore County and not subject to zoning. Areas near the easement property reflect a mix of uses, including single-family residential homes fronting Lake Jordan, rural residential homes, agricultural and recreational land, and timberland. Most of the homes with lake frontage sit further to the south and west, near the main body of the lake. The area around Lake Jordan has no residential subdivisions and little development, aside from a post office and a volunteer fire department in Titus.

B. *The Banker*

At the start of 2017, Robert Barrett, a lifelong resident of Elmore County who had lived on Lake Jordan for nearly six decades, owned 165 acres of land on which the future easement property was located.

Before his retirement, Mr. Barrett worked as a banker for more than 40 years, including stints as the president of two different banks in Wetumpka. Mr. Barrett also was an active real estate investor, having purchased 15–20 properties in Elmore County over his career, as well as others in nearby Coosa County. Mr. Barrett estimated that his real estate holdings were worth more than $3 million as of 2017.

One of Mr. Barrett's investments was the easement property, which was a five-minute boat ride across Lake Jordan from where Mr. Barrett lived (on the western side). Mr. Barrett assembled the 165 acres on which the easement property sat through a series of transactions between 1992 and 2001.

Before 2017 Mr. Barrett began to investigate the sale of the 165 acres that included the easement property. To stir up interest in the sale of either all or part of the property, he put up signs visible from the lake with lot numbers. Mr. Barrett believed that these signs might

[*5] catch the attention of a passerby on a boat. He also "opened up some logging roads on the property, so somebody could walk on it" despite the "pretty thick undergrowth."

When advertising these lots, Mr. Barrett was aware that lot size was important as Elmore County subdivision regulations might come into play if the lots were less than a certain acreage. Mr. Barrett was less concerned about topography, concluding that buyer interest in access to the lake would overcome any reservations that the lot was "hilly." Although Mr. Barrett believed that there would be demand for lots without lake frontage, he was not interested in attempting to develop such lots because of the debt necessary to do so.

At the end of 2016, Mr. Barrett faced a financial squeeze. Two of the parcels making up the bulk of the easement property were subject to a mortgage that Mr. Barrett had executed for $200,000 in September 2012. In December 2016 Mr. Barrett received a demand letter from the heirs of his uncle requesting repayment of a separate promissory note within 30 days. The stark tone of the letter aside, Mr. Barrett found that the heirs "were willing . . . to wait on the time period."

Despite these pressures, Mr. Barrett did not turn to a drastic remedy such as auctioning off the easement property to pay the mortgage and the promissory note. Mr. Barrett was confident that he "knew more than most folks about the property" and wanted to receive a fair price.

So things stood in April 2017 when Mr. Barrett's property came to the attention of Paul Thomas and, through him, Nancy Zak.

II. *The Conservation Easement Business*

A. *The Leading Players*

Mr. Thomas was a developer of rural real estate and residential subdivisions who also had experience in finding large tracts of land in the middle part of Alabama for interested buyers. Specifically, Mr. Thomas had an eye for identifying the right kind of land for conservation easement projects, which led to a business relationship with Ms. Zak.

For her part, Ms. Zak had worked in the conservation easement industry since 2002, when she started a company called Forever Forests, LLC (Forever Forests). Her early experiences involved the donation of easements over property by individual landowners, which resulted in

[*6] charitable contribution deductions under section 170 for the values of those donations. An enterprising sort, Ms. Zak changed her focus around 2009 to syndicated conservation easements.

B.    *General Contours*

Ms. Zak's investment proposition was straightforward:

> [Investors] will share ownership of a valuable tract of highly desirable development land that is also highly suitable for permanent conservation. If and when the [investors] choose to conserve this land, the investment has been priced to produce a return in the form of federal tax deductions that would be equivalent to several times the amount of each partner's initial investment.

As is usually the case with a tax-motivated transaction, the devil lay in the details. Ms. Zak's model depended on finding inexpensive properties that nonetheless could deliver high valuations, at least on paper. Such properties are difficult to find, so Ms. Zak essentially made her own.

1.    *Creating Value*

Specifically, Ms. Zak and her team worked to identify and secure options on relatively inexpensive land that, in their view, had development potential. As one of Ms. Zak's associates explained in an email with respect to another project, the "most successful candidates for easements are properties that can be purchased at a small cost, hold great value when developed at their highest potential, hold great conservation value and are in the path of ongoing development." The email set out a "general rule of thumb" that the "Highest and Best Use value when developed needs to be somewhere in the [vicinity of] 10X the cost of the land."

Over a normal year, Ms. Zak might obtain rights to 10–20 such properties. The next step—assigning a highest and best use to a property—was an exercise in creative writing. For several months, Ms. Zak and her team would work collaboratively with engineers and sometimes appraisers to pick a type of development on the property and then design plans that they knew would never be built.

At this point, the appraiser took center stage. Working in tight collaboration with Ms. Zak and her team, the appraiser would prepare multiple drafts of appraisals valuing the property according to the

[*7] purported value of the never-would-be development. Ms. Zak and her team repeatedly stressed to the appraisers the need to trumpet a property's uniqueness,[3] so as to rule out comparable sales and usher in a discounted cashflow analysis as the proper method to measure the property's worth.

Ms. Zak often retained the services of a Georgia appraiser named Wilmot McRae Greene, and his assistant Cynthia Milner, who was an appraiser herself. Mr. Greene, whose specialty was in appraising retirement communities (optimistically known as "active adult" communities), performed at least 63 conservation easement appraisals between 2013 and 2018, charging $35,000 per appraisal as of 2017. The appraisals Mr. Greene produced in this regard were specifically for conservation easements and did not meet the requirements of the banking industry and the Financial Institution Reform and Recovery Enforcement Act of 1989.

Despite not complying with banking standards, these appraisals were considerably more expensive than the land appraisals Mr. Greene performed in his home territory of northeast Georgia, for which he charged between $10,000 and $15,000. Mr. Greene attributed this price differential to research expenses.

Typically, Forever Forests would provide Mr. Greene and Ms. Milner a development plan for each project. Mr. Greene and Ms. Milner understood that Ms. Zak sought the highest valuation possible and would work to drive up the numbers of their discounted cashflow analysis by adjusting inputs such as development costs.

Although by the year at issue Ms. Milner was an enthusiastic participant in preparing appraisals for Ms. Zak's offerings, she had previously expressed reservations about the approach. As she explained to Mr. Greene in connection with a 2015 appraisal of an active adult community, the "value of an assisted care facility really lies in the 'business' of the facility, not the real estate . . . and certainly not the underlying land." She further noted that, if Ms. Zak and her team "want the highest value, then single family lots with great views provide the highest value to the underlying land . . . everything else has value in the finished product with a lower % value attributed to the land."

---

[3] In unobserved irony, Forever Forests on several occasions asked appraisers to recycle "uniqueness" descriptions.

[*8]       2.    *Technical Aspects*

While settling on the purported development value of a property, Ms. Zak and her team also would set up the vehicles necessary to implement the ultimate transaction. They would form an LLC (PropCo) managed by one of Ms. Zak's entities but wholly owned by the original property owner. A second LLC (InvestCo) would also be formed, owned by still further entities controlled by Ms. Zak or her associates. The property owner would transfer the relevant property to PropCo. InvestCo subsequently would agree to buy a large percentage, but not all (say 96%), of the original property owner's interest in PropCo.

III.    *Solicitation*

Once Ms. Zak and her team had a sense of a property's value, they set about soliciting tax professionals who might have clients interested in obtaining large tax deductions. These solicitations took different forms. At times, Ms. Zak and her team sent flyers giving a general overview of conservation easements, the structure of the transaction, and the tax risks and benefits.

Other solicitation materials were more direct. A draft email from Mr. Thomas to "friends, associates and past acquaintances" about a 2017 offering promised the return (described *supra* p. 6) of deductions "equivalent to several times the amount of each partner's initial investment." Similarly, a flyer entitled "Unique Year-End Tax Saving Strategy" noted that "by participating in a private partnership you may be able to generate conservation tax savings in the current year." This flyer provided information about Ms. Zak's "current opportunities," detailing the amount of "[d]eductions if conserved" and "capital raise" for each project.[4]

The amount of capital to be raised for a given project was calculated by dividing the value of the hypothetical development by a ratio set by Ms. Zak, which represented the rate of return in the form of tax deductions that an investor would receive from every dollar invested. By 2016 the rate of return for one of Ms. Zak's investment offerings

---

[4] By late 2017 Ms. Zak's team stated that they were "very reticent to put together promotional material other than the [private placement memorandum]" in light of I.R.S. Notice 2017-10, 2017-4 I.R.B. 544, which "identified all syndicated conservation easement transactions . . . as 'listed transactions' for purposes of Treasury Regulation § 1.6011-4(b)(2)." *See Green Valley Investors, LLC v. Commissioner*, 159 T.C. 80, 83, 103 (2022) (setting aside Notice 2017-10).

**[\*9]** was 4.5:1,[5] set not by happenstance but as an active risk mitigation strategy. A contemporaneous writing from Ms. Zak lays out her thinking:

> [S]hould the [conservation easement] be audited, because of the 4.5:1 ratio that your clients are set to benefit from, that is "risk mitigation 101". At that ratio, with the deduction held up against a Federal bracket of 39.6%, for every dollar placed, your client will see $1.78 in savings. . . . This means that the service has to go a long way in administrative adjustment to the deduction before your client is losing any money. As you would know, there are multiple levels in the audit process . . . [and if an adjustment is made] it will be appealed. . . . [Should Tax Court litigation produce a settlement], your clients are paying a deferred tax bill sometime down the road. Again, they would only begin to lose money if the partnership deduction were reduced more than 44%.

As Ms. Zak understood, smart investors could put the sizable upfront savings from the tax deduction into high-yield investments that, over the course of a lengthy audit (followed by years of litigation), could significantly reduce or even eliminate any tax, interest, and penalties to come.

The fixed ratio served another important purpose for Ms. Zak, i.e., rendering her portfolio of projects fungible and interchangeable. Ms. Zak and her team thus could shift investors between multiple projects as they saw fit, including to maximize capital raises, while assuring them that "the economics for you are the same."

Although an anticipated tax deduction was the very cornerstone of these transactions, Ms. Zak's materials always included a useful fig leaf for investors. Specifically, the materials stated that investors would have the power to vote whether to conserve the property, develop the property, or hold it for long-term investment. According to one of Ms. Zak's associates, the development option was included to satisfy "charitable intent/economic substance" and to comply with "partnership 'at risk'" rules.

---

[5] By way of illustration, if a project's value was estimated at $18 million and the set rate of return was 4.5:1, the maximum capital raise would be $4 million and an investor who invested $500,000 was promised to receive $2,250,000 in tax deductions.

**[*10]** IV.   *Money Time*

Once an offering reached an acceptable capital raise, InvestCo would close on the purchase of the agreed-upon interests in PropCo. At this point, the investors would vote for one of the three options. Unsurprisingly, given the orientation of the transaction towards deductions and the curated pool of investors, the easement option was selected for each of Ms. Zak's more than 100 offerings over her career. A final appraisal would be prepared, and PropCo would claim a charitable contribution deduction for the appraised value of the conservation easement that would be passed pro rata to the investors.

Ms. Zak and her team were well compensated for their efforts in this regard. This compensation took different forms. Often, Forever Forests (or a similar entity) entered into a generous consulting agreement as a project manager for a particular transaction, providing services including assessing a property's "potential for development and conservation," providing "guidance in planning for . . . ownership structure," managing a team's "determination of highest & best use," overseeing appraisal preparation, assuring "completion of [a] comprehensive [b]aseline [r]eport," assisting "in negotiation of [a] [c]onservation [e]asement," managing the "distribution of required IRS tax forms," and providing overall "general [p]roject [m]anagement services." The entities controlled by Ms. Zak or her associates that managed a particular InvestCo would also draw sizable management fees. These same management entities also received payment for any ownership stake.

V.   *Lake Jordan Deal*

The conservation easement and charitable contribution deduction in this case largely followed the pattern described above.

A.   *Arranging the Pieces*

In April 2017 Mr. Thomas learned of the easement property's availability. He and Ms. Zak determined that the easement property presented a development opportunity as an active adult community, in light of what Mr. Thomas saw as "a huge, enormous retiree market" from Montgomery. Mr. Thomas thought the easement property was particularly desirable because of the "water access and the beautiful water."

**[\*11]**  Mr. Barrett set a sale price of $583,000.  In reaching this price, he began with a value of $2,200 per acre for the 165 acres, "because [he] felt that was what the property was worth."  To this $363,000, he added $275,000, which represented a price of $25,000 for each of the 11 lakefront lots that he had marked.  This produced a value of $638,000, which he reduced by $55,000, to account for the cost to build a dirt road to each of the 11 lots.  Although Mr. Barrett believed that the property could have fetched up to $700,000 if he had had more time, he nonetheless considered his asking price of $583,000 to be fair.

Ms. Zak and Mr. Thomas apparently agreed.  In August they each signed on behalf of a separate LLC an option agreement with Mr. Barrett.  The option agreement stated that Mr. Barrett was contemplating forming an LLC to hold the easement property and was offering to sell a 96% share for $583,000.  For a stated option fee of $10,000, the agreement provided that the Zak and Thomas entities (or assignees) could exercise a renewable option to buy the 96% interest in Mr. Barrett's contemplated LLC.

These documents were drafted by Ms. Zak's team, not Mr. Barrett, whose approach throughout the transaction was to perform a cursory review of materials he was given.  Mr. Barrett's philosophy was that if a document "facilitated the sale, [he'd] sign . . . [so that they would] send [him] a check."

More preliminaries were checked off in September.  On September 18, 2017, Ms. Zak and Mr. Thomas formed Partners (playing the role of InvestCo), which was owned by Green Earth Reserve, LLC (Green Earth), and ThomCo Developments, LLC (ThomCo).  These entities were solely owned by Ms. Zak and Mr. Thomas, respectively.  A week later, Forever Forests formed Holdings (playing the role of PropCo), which was wholly owned by Mr. Barrett.

B.    *Finding Purpose*

1.    *Initial Efforts*

During the same busy month of September 2017, Forever Forests retained the services of J. Keith Maxwell, a civil engineer and land surveyor, to prepare a land development plan for the easement property.  Mr. Maxwell was a known commodity, having worked with Mr. Thomas on and off since 1994.  He also had experience with Ms. Zak, having completed land development plans for two Forever Forests conservation easement projects before starting his work on the easement property.

[*12] Forever Forests was an important client for Mr. Maxwell, and he offered reduced fees to remain in its good graces.

Although Mr. Maxwell was hired to develop a plan, the vision that he was executing belonged to Ms. Zak. On his previous Forever Forests projects Mr. Maxwell had understood that he was to fit as many units as possible on the property, consistent with the highest and best use identified by the owner or the owner's appraiser. The song remained the same when it came to the easement property, with Mr. Maxwell's contract explicitly obligating him to "[p]lan housing mix to maximize land use per Owner/Appraiser's suggestions."

Mr. Maxwell understood that his plan, once accepted, was to be used as part of an appraisal for a conservation easement. Nonetheless, on some of his work for Forever Forests, he had been admonished by email that his plans "should have NO MENTION of the conservation easement on it."

Mr. Maxwell's starting point was designing an active adult community on the easement property, which he knew from his previous Forever Forests work to be Mr. Greene's default highest and best use. Ms. Zak's vision was a "true active adult community with a high level of amenities." Mr. Maxwell produced multiple plan iterations over the next few months in an attempt to meet his client's requirements (and address Ms. Zak and her team's suggestions) for the easement property.

From the start, Ms. Zak took a leading part, suggesting amenities including trails, a clubhouse, pools, athletic courts, community gardens, and a marina. Mr. Maxwell was responsive to her suggestions and included them in a 606-lot development plan that he transmitted by October 30, 2017. This plan included neither a septic system nor development costs. The very next day he produced a plan that reduced the number of lots to 515, followed by yet another plan that brought the number of lots to 512. The amenities at this stage included a walking trail, a clubhouse, athletic courts, a deck, a pool, boat slips, and a gang septic system.

2. *Change in the Air*

A change of focus came in the middle of November. Mr. Greene, who had been hired because of his expertise with active adult communities, prepared a preliminary appraisal, dated November 2, 2017, based upon a highest and best use consistent with Mr. Maxwell's plan. This appraisal concluded that the fair market value of the

[*13] property would be $10,439,304 and that the value of a conservation easement would be approximately $9.8 million. Mr. Greene, however, raised concerns that the easement property might be too far away from amenities, such as a hospital and a WalMart, to support an active adult community.

Around the same time, Mr. Thomas solicited and received a development cost estimate from Mark Newson, a developer with whom he had worked in the past. Mr. Newson projected development costs of approximately $15,300,470 for the contemplated active adult community, considerably more than the $8.9 million that Mr. Greene had anticipated.

In addition to these outside concerns, Forever Forests personnel had internal discussions about amenity costs, including an expensive walking path. They also determined that 515 lots of the same product type had a slower absorption rate that would affect the property value under the discounted cashflow analysis.

Seeing that the costs and market did not match, Ms. Zak and her team pivoted. "After some serious consideration of Highest and Best Use, it's looking like Lake Jordan is not exactly right for the Active Adult model due to a number of factors, mostly due to geographic location removed from major metro areas and the cost of development on that terrain." Forever Forests requested a "new approach [that] will consider a private lakefront community that embraces life on Lake Jordan." Mr. Maxwell was directed to create "around 300 home sites," replace the boardwalk with a footpath, "[s]cale back" the clubhouse and the marina to a community docking area with storage sheds, reduce the number of sport courts, and eliminate a variety of items, including gazebos, a pool, a raised garden, a community sewer system, street lights, and a curb and gutter.

### 3. *Plan B*

This pivot produced "a plan that was much more conservative" in Ms. Zak's eyes. By November 18, 2017, just days later, Mr. Maxwell had produced a revamped layout with 216 lots. Just two days after that, Mr. Maxwell produced a conceptual master development plan for the easement property featuring 308 lots and 16,515 linear feet of streets. The amenities included a 4,800-square-foot clubhouse, a tennis court, and a pickleball court. Mr. Maxwell thereafter prepared a conservation plan for the easement property that "contemplates two potential 1-acre

**[\*14]** homesites and two potential 0.5[-]acre home sites on the 157.39[-]acre tract, only two of which may be selected for development."



By early December 2017 Mr. Greene and Ms. Milner had produced multiple draft appraisals based on Mr. Maxwell's revisions. Despite the purportedly more conservative plan, these appraisals valued the conservation easement at a minimum of $12.5 million. Mr. Greene and Ms. Milner, like Mr. Maxwell, were adept at a quick turnaround, with Ms. Milner explaining that she could provide rough appraisal numbers within a day of receiving a plan.

### 4. *Certification Letter*

In a December 26, 2017, letter, Mr. Maxwell represented that his conceptual master development plan was "feasible based on all known site conditions and with regards to all known physical and regulatory conditions." He stated that "[a]ll planning approvals, permits needed, health department approvals, and construction plan approvals can be obtained" and that his previous development projects included single-family residential lots, "most using individual on-site septic systems approved by the State of Alabama Health Department."

Mr. Maxwell, however, never applied for or obtained any certificates for electric, water, or sewer utilities. Similarly, he never submitted any documentation, despite being aware of such

[*15] requirements, to the Elmore County Commission, the Elmore County Engineer, or the Elmore County Health Department.

### C. *The Elements Snap into Place*

#### 1. *The Ownership Two-Step*

On November 30, 2017, Mr. Barrett executed a quitclaim deed that conveyed the easement deed to Holdings. The next day, Partners entered into an agreement to purchase (at a closing date of its choosing) a 95% interest in Holdings from Mr. Barrett and a 1% interest from his wife[6] for a total purchase price of $583,000.

#### 2. *Capital Raise*

After entering into this agreement, Ms. Zak and her associates turned to raising capital through a private placement memorandum (PPM). The Lake Jordan deal was one of 11 investments offered by Ms. Zak and her team during 2017.

In pitching potential investors, Mr. Thomas described the Lake Jordan project as a "[l]ast [m]inute [t]ax [s]trategy for 2017," advertising that "[i]f you have anyone in need of a year-end tax deduction, this project could yield a 4.5 to 1 ratio based upon its completion and vote." Mr. Thomas also drafted a response to inquiries that pointed out the success rate of both Ms. Zak and Mr. Greene with respect to audits, as well as the sizable litigation fund contemplated for this project. Ms. Zak likewise sent promotional materials to investors for "current conservation projects" that included the Lake Jordan project.

The PPM sought a maximum capital raise of $2,638,350, with a minimum investment of $42,640. It stated that members would be required to vote among three options for the use of the easement property: (1) development; (2) donation of a conservation easement; and (3) holding the easement property as an investment. Attached to the PPM were, inter alia, excerpts of a December 1, 2017, appraisal by Mr. Greene, which determined the fair market value of the easement

---

[6] The agreement to purchase Mrs. Barrett's interest in Holdings predated the existence of such an interest. Mrs. Barrett was admitted as a member of Holdings on December 13, 2017, approximately two weeks after the purchase agreement was executed.

[*16] property was $13,049,376 and the fair market value of a conservation easement was $12,507,607.

The main part of the PPM addressed the mechanics and tax implications of a conservation easement donation. The PPM noted the risks of examination and disallowance of the deduction, even going so far as to include a table that tracked the results of 52 cases in this Court involving conservation easements.

The PPM highlighted considerable drawbacks for the non-conservation options. It explained that development could last four or more years and would require additional funding or debt of approximately $2.5 million. The PPM also noted assorted risks for holding the easement property for investment. It further warned that Partners "may be unable to sell" its membership interests in Holdings or the easement property "for an amount deemed reasonable, . . . or at all."

Prospective investors focused on the tax aspect of the transaction. One investor bluntly told Mr. Thomas that he wanted $500,000 in deductions and was wiring $111,111. Another investor expressed interest in the Lake Jordan project because "a smaller deal may be less likely to be audited." Through the concerted efforts of Ms. Zak and her team, Partners was able to recruit sufficient capital by December 28, 2017, for the Lake Jordan project to move forward.

### 3. *Breaking the Tape*

The late date left Ms. Zak and her associates with little time to close the transaction before the end of the year. This problem was exacerbated by the fact that December 31, 2017, fell on a Sunday, leaving only two business days (December 28 and 29) to finish all necessary work. They acted with dispatch.

On December 28, 2017, Ms. Zak and her team executed amended and restated LLC agreements for both Holdings and Partners. They also collected votes from the investors (now members) in Partners, who voted overwhelmingly for the conservation easement option.[7]

---

[7] The one person who voted against the conservation easement option was the same person who noted his view that a smaller deal was less likely to be audited. After being questioned by an incredulous Forever Forests representative, this person

**[*17]** Ms. Zak and Mr. Thomas executed a Development Management Agreement on behalf of Holdings and Tomazak Development, LLC (Tomazak), which they jointly owned. According to this lengthy agreement, Tomazak agreed to perform a wide variety of services should the development option be selected. If the development option were not selected, the agreement provided that Tomazak would receive $500,000 for its trouble.

On December 29, 2017, Partners wired the Barretts $369,926 and made a payment of $203,074 to release the mortgage, consistent with the December 1, 2017, purchase agreement. For their part, the Barretts executed an agreement assigning to Partners 96 shares in Holdings. This assignment extinguished Mrs. Barrett's interest in Holdings and left Mr. Barrett with only 4 shares. At this point, Green Earth (owned by Ms. Zak), ThomCo (Mr. Thomas), and the investors owned membership interests in Partners, which owned 96% of Holdings, with Mr. Barrett owning the rest.

Later on December 29, 2017, Holdings donated a conservation easement over the easement property to the Foothills Land Conservancy, a section 501(c)(3) organization. This deed was recorded the same day in Elmore County Probate Court.

According to a December 29, 2017, closing statement, Partners raised $2,549,363 in capital for the Lake Jordan transaction. After removing the amounts paid to the Barretts and their mortgage holder, and the escrow fee ($3,500), $1,972,863 remained for disbursement. Forever Forests was paid $100,000 for its consulting services. Green Earth and ThomCo were each paid $126,720 for the redemption of their interests in Partners. For its part, Holdings received $725,412, leaving $894,011 for Partners.

The Russian nesting doll of payments to Ms. Zak and Mr. Thomas did not end there, however. The December 29 vote to conserve the easement property triggered the $500,000 payment to Tomazak that had been agreed to the day before. Moreover, Green Earth and ThomCo collectively would be paid $337,000 in management fees by Partners.

---

responded: "Wouldn't I still be 'required' to comply with the majority vote, which would be for the CE, and I would still receive a K-1 with a 4.5 x charitable contribution?" This vote was a transparent attempt to distance the investor from the transaction while enjoying its tax benefits.

**[\*18]** Considering only the payments to Green Earth (Ms. Zak), ThomCo (Mr. Thomas), and Tomazak (jointly owned), Ms. Zak and Mr. Thomas each netted $545,220 ($126,720 + $250,000 + $168,500) for their respective roles in the donation of a conservation easement over a portion of land that Mr. Barrett had been willing to sell for $583,000.

VI.  *Appraisal*

A.  *The Authors*

Mr. Greene, assisted by Ms. Milner, finished work on the final appraisal report on March 9, 2018.  The principal labor fell to Ms. Milner, who was responsible for internet "research" of market information and comparable sales, which were used in the appraisal.  She also wrote the narrative portions of the appraisal in light of the market data and information about the area and served as the primary point of contact with Ms. Zak's team.  Ms. Milner also entered the inputs that Mr. Greene chose into valuation models and discussed substantive issues with him, including the selection of comparable properties.  Despite her significant contributions, Ms. Milner did not sign the appraisal or the appraisal summary.

For his part, Mr. Greene offered direction and supervision, taking ultimate responsibility for the appraisal.  Although Mr. Greene was a certified real estate appraiser in Georgia, Tennessee, and South Carolina at the time the appraisal was prepared, he did not hold any Alabama real estate appraiser's license.[8]  At the time he completed his appraisal in this case, Mr. Greene was an affiliate member of the Appraisal Institute and a member of the National Association of Independent Fee Appraisers, a trade organization of independent appraisers, which designated him with an IFAS certification.

B.  *The Report*

To value the easement, Mr. Greene and Ms. Milner used the "before and after" method.  This method involved first valuing the easement property before the granting of the easement and then

---

[8] In a declaration prepared during the pendency of this case, Mr. Greene swore under penalty of perjury that "[a]s of the Donation Date, I was a Certified General Real Property Appraiser with the state of Alabama (License Number G01401)."  Mr. Greene subsequently admitted that when he made the declaration he knew that he did not have such a license on the donation date.  Given Mr. Greene's admission that he lied to this Court, we will treat his representations with justly earned suspicion.

**[*19]** determining the value of the easement property after the granting of the easement. The difference between the values equals the easement's value.

As part of this determination, the appraisal concluded that the highest and best use of the easement property before the granting of the easement was as a lakeside residential community. Perhaps showing its roots, the appraisal often slipped and described the highest and best use as an active adult community. In Mr. Greene's eyes (at least at the time of trial), there was not much separating the two, only "a restriction of 55 and over" and "smaller lots" in active adult communities.

Consistent with the instructions Ms. Zak and her team gave their appraisers, the appraisal asserted that the easement property was unique. It first contended that its uniqueness lay in the fact that "it is a property with a picturesque setting along the banks of a waterway in need of protection from uncontrolled development." Later, the appraisal added that "its outstanding physical features as well as its immediate accessibility to roadways" contributed to its unicorn status. Finally, it noted that the purely hypothetical "use as an active adult community with dense development and a highly developed amenity package, along with the location of the property at the waterfront, provide a unique development."

The appraisal stated that the uniqueness of the property ruled out using sales of comparable properties to determine the before-easement value. Instead, Mr. Greene turned to a discounted cashflow analysis, which he summarized as "valuing the lots and estimating development costs, projecting lot sales, and discounting that to a present worth." The discounted cashflow analysis produced a before-easement value of $13,049,376. Having calculated an after-easement value of $308,097, the appraisal concluded that the value of the easement was $12,741,279 ($13,049,376 – $308,097), which was rounded to $12,740,000.

This value was considerably greater than the $9.8 million easement value produced by an active adult community on the easement property, even though, according to Ms. Milner, retirement communities are "more valuable than standard community subdivisions." This counterintuitive result stemmed from changes to several inputs into the discounted cashflow analysis. First, the appraisal concluded that lot prices averaged $110,000 (rather than $97,000) based on larger lot sizes. Second, the appraisal slashed development costs from $8.9 million to

[*20] $4,271,560, removing septic systems and reducing amenities. Cutting costs even extended to road design, resulting in roads so narrow that two vehicles could not pass each other. Finally, the appraisal increased the absorption rate, i.e., how quickly lots would be purchased, while reducing the discount rate.

In preparing this report, Mr. Greene and Ms. Milner liberally cut and pasted from assorted data sources without attribution. For example, the market data and economic trends sections of the report were directly lifted from online sources including Wikipedia.

VII.   *Tax Returns*

To prepare its 2017 tax returns, Holdings hired Kimberly Skalski, a certified public accountant who specialized in returns involving conservation easements. Ms. Skalski understood that Partners' acquisition of a 96% interest in Holdings on December 29, 2017, resulted in a technical termination of the partnership under section 708(b)(1).

In light of the technical termination, Ms. Skalski prepared two short-year tax returns. The first covered the period from September 25, 2017, the date of Holdings' inception, through December 28, 2017. Although the technical termination took place on December 29, 2017, Ms. Skalski was under the impression that the first short-year return could not end on the same date as the second short-year return began.

The second tax return began on December 29, 2017, and ended on December 31, 2017. On that return Lake Jordan deducted $12,740,000 as a charitable contribution for its donation of the conservation easement. Ms. Skalski understood that "the closing of the easement [donation] happened after the ownership change . . . so [the deduction] was allocated to Lake Jordan Partners and the Barretts in ownership percentages."

Ms. Skalski attached several documents to the second return: (1) Mr. Greene's final appraisal, which he neither signed nor dated; (2) Schedules K–1, Partner's Share of Income, Deductions, Credits, etc., for Partners and Mr. Barrett, which allocated the charitable contribution deduction in accordance with each party's respective interest in Holdings; and (3) Form 8283, Noncash Charitable Contributions, for the donation of the conservation easement. In addition to these documents, Ms. Skalski also attached to the return a baseline documentation report dated December 28, 2017, from Foothills

**[\*21]** Land Conservancy and Form 8886, Reportable Transaction Disclosure Statement, as required by Notice 2017-10.

## VIII. *Notice of Final Partnership Administrative Adjustment*

After an examination, the Internal Revenue Service (IRS) issued a notice of final partnership administrative adjustment (FPAA) to Holdings, disallowing the $12,740,000 deduction it claimed on its tax return for its short year ending December 31, 2017. The IRS determined that Holdings (1) had "not established that [it] made a noncash charitable contribution during the tax year ended December 31, 2017," (2) had "failed to establish that it satisfied all the requirements of I.R.C. § 170 and the corresponding Treasury Regulations," and (3) had not established "the value of the noncash charitable contribution."

In the FPAA, the IRS also asserted a variety of penalties, including the 40% gross valuation misstatement penalty under section 6662(h), the 20% reportable transaction understatement penalty under section 6662A, and the 20% accuracy-related penalties under section 6662(c), (d), and (e). Partners timely petitioned this Court for readjustment.

## OPINION

## I. *Burden of Proof*

Generally, the IRS's adjustments in an FPAA are presumed correct, and the taxpayer bears the burden of proving them wrong. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Crescent Holdings, LLC v. Commissioner*, 141 T.C. 477, 485 (2013). The taxpayer also bears the burden of proving entitlement to any deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer meets certain conditions. Partners does not claim that it satisfies section 7491 but asserts that the Commissioner's determinations are arbitrary and capricious, stripping the FPAA of the presumption of correctness and shifting the burden of proof to the Commissioner. *See, e.g.*, *United States v. Janis*, 428 U.S. 433, 441 (1976); *Helvering v. Taylor*, 293 U.S. 507, 514–15 (1935); *Carson v. United States*, 560 F.2d 693, 696 (5th Cir. 1977).

The resolution of the issues in this case does not turn on which party bears the burden of proof, however. "In a case where the standard

[*22] of proof is preponderance of the evidence and the preponderance of the evidence favors one party, we may decide the case on the weight of the evidence and not on an allocation of the burden of proof." *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340; *see also Geiger v. Commissioner*, 279 F. App'x 834, 835 (11th Cir. 2008) ("[T]he burden is of practical consequence only in the rare event of an evidentiary tie."), *aff'g* T.C. Memo. 2006-271. Seeing no tie here, we can resolve the issues on the preponderance of the evidence. *See Knudsen*, 131 T.C. at 189; *Bordelon v. Commissioner*, T.C. Memo. 2020-26, at *11.[9]

## II. *Charitable Contribution Deduction*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. If a taxpayer makes a gift of property other than money, the amount of the contribution is generally equal to the fair market value of such property at the time of the gift. *See* Treas. Reg. § 1.170A-1(c)(1).

Generally, no deduction is allowed for a contribution of less than a donor's entire interest in property. I.R.C. § 170(f)(3)(A). Section 170(f)(3)(B)(iii) excepts from this blanket prohibition a deduction for a contribution of a partial interest in property that constitutes a "qualified conservation contribution." A "qualified conservation contribution" is defined as a contribution made (1) of a qualified real property interest, (2) to a qualified organization, and (3) exclusively for conservation purposes. I.R.C. § 170(h)(1).

The parties largely stipulated that the donation at issue satisfied these requirements, with the Commissioner reserving only a narrow set of challenges to the donation's conservation purpose. The Commissioner did not raise such challenges in his posttrial brief, and we accordingly

---

[9] Even if we were to entertain Partners' argument as to the purportedly arbitrary and capricious FPAA, the U.S. Court of Appeals for the Eleventh Circuit "differentiates between unreported income and deductions when determining whether the burden of proof should shift to the Commissioner." *See Beaverdam Creek Holdings, LLC v. Commissioner*, T.C. Memo. 2025-53, at *23; *see also Gatlin v. Commissioner*, 754 F.2d 921, 923–24 (11th Cir. 1985), *aff'g per curiam* T.C. Memo. 1982-489. In the Eleventh Circuit "the taxpayer bears the burden of proving his or her entitlement to the deductions claimed '[a]t all times.' . . . *Gatlin v. Commissioner*, [754 F.2d] at 923. Thus, even assuming the notice of deficiency was arbitrary and capricious, the burden remains with [the taxpayer] to prove its entitlement to the deductions claimed." *Peco Foods, Inc. v. Commissioner*, T.C. Memo. 2012-18, 2012 WL 129806, at *4 n.5, *aff'd*, 522 F. App'x 840 (11th Cir. 2013).

**[\*23]** deem these issues abandoned or conceded. *See, e.g.*, *Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned."); *see also Estate of Atkinson v. Commissioner*, 115 T.C. 26, 35 (2000) (deeming issue not addressed in posttrial brief to be waived or conceded), *aff'd*, 309 F.3d 1290 (11th Cir. 2002); *Amos v. Commissioner*, T.C. Memo. 2022-109, at \*8 n.6, *aff'd*, No. 23-10532, 2024 WL 1406646 (11th Cir. Apr. 2, 2024).

The Commissioner nonetheless advances three independent grounds for the denial of Holdings' charitable contribution deduction in its entirety. First, he argues that Holdings lacked the donative intent needed for a charitable contribution under section 170(a)(1). Second, he asserts that Holdings claimed the charitable contribution deduction on the tax return for the wrong short taxable year. Third, the Commissioner contends that Holdings failed to obtain the qualified appraisal required by section 170(f)(11)(D).

A.    *Donative Intent*

We first reject the Commissioner's contention that Holdings lacked the requisite donative intent because the charitable contribution was motivated by a desire to monetize a tax deduction for investors (thereby netting sizable fees for the various Zak entities and associates that structured the transaction). According to the Commissioner, a desire for filthy lucre places a donation outside the bounds of a deductible charitable contribution. We have rejected similar arguments before, *see, e.g.*, *Seabrook Prop., LLC v. Commissioner*, T.C. Memo. 2025-6, at \*22–24; *J L Mins., LLC v. Commissioner*, T.C. Memo. 2024-93, at \*28; *Buckelew Farm, LLC v. Commissioner*, T.C. Memo. 2024-52, at \*42, *aff'd*, No. 24-13268, 2025 WL 2502669 (11th Cir. Sept. 2, 2025); *Oconee Landing Prop., LLC v. Commissioner*, T.C. Memo. 2024-25, at \*37–38, *supplemented by* T.C. Memo. 2024-73; *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at \*28, and do so again here.

To recap, we have "found the objective fact that a perpetual conservation easement was donated to a charitable organization defeated the Commissioner's contention as to the donor's subjective intent." *Seabrook*, T.C. Memo. 2025-6, at \*23; *see also Mill Road*, T.C. Memo. 2023-129, at \*28 (stating that "a donor motivated by guilt, or by the hope of being admired, or by the desire for a tax benefit, may still deduct his contribution" consistent with Congress's longstanding

[*24] decision "to incentivize charitable contributions by allowing a deduction").

We further remain unpersuaded that this situation constitutes a quid pro quo exchange. "If a transaction with a charity 'is structured as a *quid pro quo* exchange'—i.e., if the taxpayer receives property or services equal in value to what he conveyed—there is no 'contribution or gift' within the meaning of the statute." *Oconee Landing*, T.C. Memo. 2024-25, at *37 (quoting *Hernandez v. Commissioner*, 490 U.S. 680, 701–02 (1989)). "[U]nlike the quid pro quo cases the Commissioner cited, any benefits to the taxpayer from contributing the easement were provided not by the recipient of the easement, but by the U.S. Treasury." *Seabrook*, T.C. Memo. 2025-6, at *23–24; *see J L Mins.*, T.C. Memo. 2024-93, at *28. We are aware of no case in which the tax benefits associated with a charitable contribution count as a quo that negates the donor's charitable intent. *See Buckelew Farm*, T.C. Memo. 2024-52, at *43; *see also Oconee Landing*, T.C. Memo. 2024-25, at *38.

B. *Technical Termination*

We likewise reject the Commissioner's argument that the "technical termination" of Holdings that resulted from the ownership changes on December 28, 2017, meant that Holdings had claimed its charitable contribution deduction for the wrong tax year and was thus ineligible. We have addressed this issue in the not-too-distant past, *see Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at *21–25, and nothing compels a different result here.

Generally, "all items of gross income and deduction must be reflected in terms of their posture at the close of [a taxable] year." *United States v. Consol. Edison Co. of N.Y.*, 366 U.S. 380, 384 (1961). Section 441(b)(1) defines the term "taxable year" as the taxpayer's annual accounting period. When a taxpayer is in existence for less than 12 months (a so-called short period), (1) it is required to file a return for the short period in which it exists, I.R.C. § 443(a)(2), and (2) the taxable year is the period for which the return is made, I.R.C. § 441(b)(3).

Although a partnership is not subject to tax, it must file a return for each taxable year in which it exists, with its taxable year determined as though it were a taxpayer. *See* I.R.C. §§ 701, 706(b)(1)(A), 6031(a). A partnership has a short taxable year if it terminates during its taxable year. *See Savannah Shoals*, T.C. Memo. 2024-35, at *20. Although a

**[\*25]** partnership's taxable year does not close when a partner sells all or part of its partnership interest as a general matter, *see* I.R.C. § 706(c), section 708(b)(1)(B) provides that a partnership terminates when 50% or more of its total capital and profits interest is sold or exchanged within a 12-month period. Such a "technical termination" occurs on the date of the sale or exchange of a partnership interest that crests the 50% threshold, when added with other sales or exchanges in the preceding 12 months. Treas. Reg. § 1.708-1(b)(3)(ii).

In the case of a technical termination, "a new partnership is deemed formed and it must also file a separate partnership return for the remaining period of the partnership taxable year." *Savannah Shoals*, T.C. Memo. 2024-35, at \*21. Although neither the Code nor the Treasury regulations address on which date the new partnership's taxable year begins, Treasury Regulation § 1.708-1(b)(4) provides that the new partnership is formed "immediately" after the technical termination. *See Savannah Shoals*, T.C. Memo. 2024-35, at \*23. And "[n]othing in the Code or the regulations precludes a partnership that is deemed to form immediately after a technical termination from using the date of the technical termination as the start date of its taxable year." *Id.* at \*25.

The parties agree that on December 29, 2017, Mr. and Mrs. Barrett sold a 96% interest in Holdings to Partners and that sale resulted in a technical termination. The new partnership was deemed formed "immediately thereafter" and then donated the conservation easement to Foothills Land Conservancy.

At this point things get a little messy. Ms. Skalski, who was hired to prepare the short-year tax returns, believed that the first short-year could not end on the same date the second short-year began. Understanding that the donation of the conservation easement was the *raison d'etre* of the transaction, she prepared (1) the first return to cover the period from September 25, 2017, the date of Holdings' inception, through December 28, 2017, and (2) the second return to cover the period beginning on December 29, 2017, and ending on December 31, 2017. The conservation easement donation was reflected on the second return, with the resulting deduction "allocated to Lake Jordan Partners and the Barretts in ownership percentages."

Admittedly, the first short year tax return was incorrect and should have ended on December 29, 2017, when the technical termination occurred. *See* I.R.C. § 708(b)(1)(B); *see also* Treas. Reg.

**[\*26]** § 1.708-1(b)(3)(ii). This error, however, does not infect or invalidate the second short-year tax return. Neither the Code nor the Treasury regulations preclude a new partnership from using the date of the technical termination as the start date of its taxable year. *Savannah Shoals*, T.C. Memo. 2024-35, at \*25; *see also* Treas. Reg. § 1.708-1(b)(4). Using the date of the technical termination as the start date of the new partnership's taxable year makes sense when the new partnership realizes income or incurs an expense after the technical termination. *See Savannah Shoals*, T.C. Memo. 2024-35, at \*24. To bar a new partnership from starting its taxable year on the date on which it springs to life would "distort[] the allocation of the easement deduction away from the partners that incurred the expense," i.e., the partners of Holdings when it made the easement donation. *Id.*

The Commissioner's arguments for a different result are not persuasive. The Commissioner asserts that the existence of a new partnership "immediately" after the technical termination, *see* Treas. Reg. § 1.708-1(b)(4), does not resolve the question of when the new partnership's taxable year begins. As support, he relies on Treasury Regulation § 1.443-1(a)(1), which provides that "a separate return must be filed for the short period of less than 12 months beginning with the day following the close of the old taxable year."

This regulation, however, explicitly applies in the case of a change of annual accounting period, *id.*, not where a taxpayer is not in existence for the entire taxable year as here, *id.* subpara. (2). The Commissioner offers no reason to import this language from one regulatory provision into another that conspicuously omits it, and there are strong reasons not to do so. *Cf. Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) (per curiam))); *Goodman v. Shulkin*, 870 F.3d 1383, 1386 (Fed. Cir. 2017) ("[T]he rules of statutory construction apply when interpreting an agency regulation." (quoting *Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006))).

**[*27]** The Commissioner attempts to draw further support for his position from the varying interest rule embodied in Treasury Regulation § 1.706-4. This rule, however, addresses the effect of changes in partnership interests in determining a partner's distributive share, not the effect of a technical termination where one partnership has ended and another deemed formed.

The Commissioner has provided no good reason why the taxable year of a partnership deemed formed "immediately" after a technical termination should not begin at the time of formation, so as to account for any business conducted by the new partnership and to allocate income and expenses to the proper parties. *Savannah Shoals*, T.C. Memo. 2024-35, at *24–25. We accordingly conclude that the easement donation deduction was properly claimed on Holdings' second short-year partnership return.

C.     *Qualified Appraisal*

Section 170(f)(11)(D) and (E) generally provides that a charitable contribution deduction claim exceeding $500,000 must be accompanied by, inter alia, a qualified appraisal by a qualified appraiser. The Code defines each term. A "qualified appraisal" is one that (1) meets requirements set forth by "regulations or other guidance prescribed by the Secretary" and (2) "is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed." I.R.C. § 170(f)(11)(E)(i). One such regulation requires the appraiser to sign and date the appraisal. Treas. Reg. § 1.170A-13(c)(3)(i)(B).

According to section 170(f)(11)(E)(ii), the term "qualified appraiser" means an individual who:

(I) has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum education and experience requirements set forth in regulations prescribed by the Secretary,

(II) regularly performs appraisals for which the individual receives compensation, and

(III) meets such other requirements as may be prescribed by the Secretary in regulations or other guidance.

[*28] The Code further provides that, in connection with a specific appraisal, the appraiser, to be deemed qualified, must "demonstrate[] verifiable education and experience in valuing the type of property subject to the appraisal." I.R.C. § 170(f)(11)(E)(iii)(I).

The Commissioner argues that Mr. Greene's work suffers from three fatal defects[10]: (1) Mr. Greene was not licensed in Alabama when he performed the appraisal; (2) Mr. Greene's appraisal was not prepared in accordance with generally accepted appraisal standards in that it violated various requirements of the Uniform Standards of Professional Conduct (USPAP); and (3) Ms. Milner failed to sign the appraisal summary as an author. None of these issues is disqualifying.

1. *Licensure*

The Commissioner first contends that Mr. Greene's lack of Alabama licensure at the time he performed the appraisal meant that he was not a qualified appraiser. Neither the Code nor the applicable Treasury regulations imposes such a requirement. The Code requires *either* an appraisal designation from a recognized professional appraiser organization *or* satisfaction of education and experience requirement set forth in the Treasury regulations. *See* I.R.C. § 170(f)(11)(E)(ii)(I).

At the time the appraisal was finalized, i.e., March 9, 2018, Mr. Greene had received an IFAS designation by the National Association of Independent Fee Appraisers, satisfying the terms of the Code. This designation also comports with Treasury Regulation § 1.170A-17(b)(2)(iii),[11] which defines a recognized appraiser designation to mean "a designation awarded by a generally recognized professional appraiser organization on the basis of demonstrated competency." Although the Commissioner pooh-poohs the National Association of Independent Fee Appraisers, he has failed to refute that it counts as a generally

---

[10] For the first time, in his answering brief the Commissioner argues that Mr. Greene was not a qualified appraiser under Treasury Regulation § 1.170A-13(c)(5)(ii), which provides that an appraiser is not qualified if "the donor [here, Holdings] had knowledge of facts that would cause a reasonable person to expect the appraiser [Mr. Greene] falsely to overstate the value of the donated property." The Commissioner did not raise this argument in his opening brief and thus has forfeited it. *See Considine v. Commissioner*, 74 T.C. 955, 969–70 (1980); *see also Root v. Commissioner*, T.C. Memo. 2025-51, at *2 n.2.

[11] Although Treasury Regulation § 1.170A-17 applies to contributions made on or after January 1, 2019, it provides that "[t]axpayers may rely on [this regulation] for appraisals prepared for returns . . . filed after August 17, 2006." Treas. Reg. § 1.170A-17(c); *see also Savannah Shoals*, T.C. Memo. 2024-35, at *26.

**[\*29]** recognized appraiser organization or that the designation was awarded on the basis of competency.

### 2. *Generally Accepted Appraisal Standards*

The Commissioner further argues that Mr. Greene's appraisal fails to meet "generally accepted appraisal standards" as required by section 170(f)(11)(E)(i). "Generally accepted appraisal standards" are defined as "the substance and principles of [USPAP], as developed by the Appraisal Standards Board of the Appraisal Foundation." Treas. Reg. § 1.170A-17(a)(2).

The parties battle over the appraisal's compliance with assorted USPAP standards. The Commissioner points to ostensible omissions in the appraisal, such as the acquisition of the 165 acres in November 2017 and the purchase agreement entered into by Partners and Mr. Barrett and argues that these omissions undermine the appraisal in multiple respects. The Commissioner also critiques the appraisal's general sloppiness (particularly with respect to highest and best use) and tendentious assumptions (specifically relating to the discounted cash flow geared to producing a high valuation).

"Appraising is not an exact science and has a subjective nature." *Gorra v. Commissioner*, T.C. Memo. 2013-254, at \*48; *see also J L Mins.*, T.C. Memo. 2024-93, at \*36–37; *Buckelew Farm*, T.C. Memo. 2024-52, at \*48–49. Although the Commissioner has identified multiple areas that cause us to doubt Mr. Greene's work,[12] we are unconvinced that the appraisal is fundamentally inconsistent with USPAP substance and principles. *Cf. Savannah Shoals*, T.C. Memo. 2024-35, at \*27 (noting that the purpose of the appraisal is to "provide the IRS with information sufficient to evaluate claimed deductions and assist it in detecting overvaluations of donated property" (quoting *Costello v. Commissioner*, T.C. Memo. 2015-87, at \*17)). Any failures to comply with USPAP in Mr. Greene's appraisal "go more to the credibility and weight of the appraisal and not to whether the appraisal complies with generally accepted appraisal standards." *Buckelew Farm*, T.C. Memo. 2024-52, at \*49; *see also Whitehouse Hotel Ltd. P'ship v. Commissioner* (*Whitehouse I*), 131 T.C. 112, 127–28 (2008), *vacated and remanded*, *Whitehouse Hotel Ltd. P'ship v. Commissioner* (*Whitehouse II*), 615 F.3d 321 (5th Cir. 2010); T.D. 9836, 2018-33 I.R.B. 291, 294 ("[T]he final

---

[12] Holdings itself apparently shares these concerns, as evidenced by its decision not to rely on Mr. Greene's appraisal or valuation in this proceeding and to drop the purported value of the easement in half.

**[\*30]** regulations do not adopt the recommendation to require strict compliance with USPAP and retain the requirement of consistency with the substance and principles of USPAP.").

### 3. *Ms. Milner*

On a related note, the Commissioner asserts that Holdings failed to satisfy section 170(f)(11)(C) because Ms. Milner did not sign the appraisal or the appraisal summary attached to Holdings' tax return. Generally, a taxpayer must attach an appraisal summary to a return claiming noncash charitable contributions greater than $5,000. *See* Treas. Reg. § 1.170A-13(c)(2)(i)(B). This appraisal summary, inter alia, must be "signed and dated by the qualified appraiser . . . who prepared the qualified appraisal." *Id.* subpara. (4)(i)(C). If "two or more appraisers contribute to a single appraisal, each appraiser shall comply with . . . signing the qualified appraisal and appraisal summary." *Id.* subpara. (5)(iii).

The Commissioner argues that Ms. Milner essentially wrote the report, with Mr. Greene playing a limited, supporting role at the end to goose the value. Although Ms. Milner played a significant role in preparing the appraisal, we are persuaded that she did so as Mr. Greene's subordinate and under his ultimate direction and supervision as to all decisions material to the appraisal. To put it another way, Ms. Milner did most of the grunt work, but the ultimate responsibility for the appraisal rested with Mr. Greene. *See Zarlengo v. Commissioner*, T.C. Memo. 2014-161, at \*40; *see also Mill Road*, T.C. Memo. 2023-129, at \*45. We accordingly find that the appraisal and the appraisal summary did not violate Treasury Regulation § 1.170A-13(c)(5)(iii).

## III. *Deduction Amount*

### A. *Valuation Principles*

Generally, the amount of a charitable contribution deduction under section 170(a) for a donation of property other than money is the "fair market value" of the property at the time of the donation. Treas. Reg. § 1.170A-1(c)(1); *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1369 (11th Cir. 2021). Treasury Regulation § 1.170A-1(c)(2) defines fair market value to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *See also Anselmo v. Commissioner*, 757 F.2d 1208, 1213 (11th Cir. 1985), *aff'g* 80 T.C. 872

**[\*31]** (1983). "This definition, a fixture in the Treasury Regulations since 1972, is universally acknowledged by professional appraisers when valuing charitable contributions of property." *Corning Place Ohio, LLC v. Commissioner*, T.C. Memo. 2024-72, at \*27, *aff'd*, No. 25-1093, 2025 WL 3089710 (6th Cir. Nov. 5, 2025); *see also Value, Black's Law Dictionary* (4th ed. 1968) (defining "'[v]alue' of land for purpose of taxation" as the "price that would probably be paid therefor after fair negotiations between willing seller and buyer"); Interagency Land Acquisition Conference, *Uniform Appraisal Standards for Federal Land Acquisitions* 3 (1971) (defining fair market value as "the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would be sold by a knowledgeable owner willing but not obligated to sell to a knowledgeable purchaser who desired but is not obligated to buy").

The value of a property on a certain date is a question of fact to be resolved on the basis of the entire record. *See Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965); *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369; *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d 982, 994 (11th Cir. 2016), *aff'g in part, rev'g in part, and remanding* T.C. Memo. 2014-79; *Oconee Landing*, T.C. Memo. 2024-25, at \*58. "As the Supreme Court observed long ago, '[a]t best, evidence of value is largely a matter of opinion, especially as to real estate.'" *Paul-Adams Quarry Tr., LLC v. Commissioner*, T.C. Memo. 2025-112, at \*39 (quoting *Mont. Ry. Co. v. Warren*, 137 U.S. 348, 353 (1890)).

The parties have retained experts to assist our inquiry. We evaluate their opinions in light of each expert's qualifications and the evidence in the record, and we may accept an "opinion in toto or accept aspects . . . that we find reliable." *Oconee Landing*, T.C. Memo. 2024-25, at \*58; *see also Savannah Shoals*, T.C. Memo. 2024-35, at \*35. We also "may determine fair market value on the basis of our own examination of the evidence in the record." *Savannah Shoals*, T.C. Memo. 2024-35, at \*35; *see also Seabrook*, T.C. Memo. 2025-6, at \*36; *Buckelew Farm*, T.C. Memo. 2024-52, at \*51.

As no substantial record of sales of easements comparable to the easement at issue exists, the parties agree that it should be valued by calculating the difference between the fair market value of the easement property before and after Holdings granted the easement. *See, e.g., TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 ("'[I]f no substantial record of market-place sales is available to use as a

**[\*32]** meaningful or valid comparison,' the 'before-and-after' valuation method is used." (quoting Treas. Reg. § 1.170A-14(h)(3)(i))); *Esgar Corp. v. Commissioner*, T.C. Memo. 2012-35, 2012 WL 371809, at \*7, *aff'd*, 744 F.3d 648 (10th Cir. 2014). The parties have stipulated that the value of the easement property after the granting of the easement was $285,000.

In deciding the "before value," we must take into account not only the actual use of the easement property when the easement was granted in December 2017, but also its highest and best use. *See TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369–70; *Ranch Springs, LLC v. Commissioner*, No. 11794-21, 164 T.C., slip op. at 33, 41–42 (Mar. 31, 2025); *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(ii). Although this "concept 'is an element in the determination of fair market value, . . . it does not eliminate the requirement that a hypothetical willing buyer would purchase the subject property for the indicated value.'" *Excelsior Aggregates, LLC v. Commissioner*, T.C. Memo. 2024-60, at \*47 (quoting *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 336 (2011)); *see also Ranch Springs*, 164 T.C., slip op. at 41–42; *Corning Place*, T.C. Memo. 2024-72, at \*41.

B.    *Highest and Best Use*

1.    *Legal Overview*

"To determine a property's highest and best reasonably probable use, the court focuses on '[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'" *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 996 (quoting *Symington v. Commissioner*, 87 T.C. 892, 897 (1986));[13] *see also Olson v. United States*, 292 U.S. 246, 255 (1934); *Ranch Springs*, 164 T.C., slip op. at 33; *Seabrook*, T.C. Memo. 2025-6,

---

[13] In a recent unpublished opinion affirming a decision of this Court, *Buckelew Farm, LLC v. Commissioner*, 2025 WL 2502669, at \*6, the Eleventh Circuit observed:

> In applying the highest-and-best-use standard, courts account for several factors, including (1) the current use of the property, (2) the likelihood that the property would be developed absent the easement, (3) how the property would be developed, and (4) "any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use." *TOT Prop. Holdings,* 1 F.4th at 1369 (quoting 26 C.F.R. § 1.170A-14(h)(3)(ii)).

Eleventh Circuit Rule 36-2 provides, in relevant part, that "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." We cite this *Buckelew Farm* opinion for that purpose.

**[\*33]** at \*37. "The highest and best use inquiry is one of objective probabilities." *Seabrook*, T.C. Memo. 2025-6, at \*37 (quoting *Esgar Corp. v. Commissioner*, 744 F.3d at 657); *see also Beaverdam Creek*, T.C. Memo. 2025-53, at \*40.

"Because property owners have an economic incentive to put their land to its most productive use, a property's [highest and best use] is presumed to be its current use absent proof to the contrary." *Ranch Springs*, 164 T.C., slip op. at 41; *see also Corning Place Ohio, LLC v. Commissioner*, 2025 WL 3089710, at \*4 ("We start with the assumption that the current use amounts to its best use."); *United States v. Buhler*, 305 F.2d 319, 328 (5th Cir. 1962) ("[E]conomic demands normally result in an owner's putting his land to the most advantageous use."); *Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*7. Where "an asserted highest and best use differs from current use, the use must be reasonably probable and have real market value." *Esgar Corp. v. Commissioner*, 2012 WL 371809, at \*7 (citing *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991)); *accord Corning Place Ohio, LLC v. Commissioner*, 2025 WL 3089710, at \*4 ("Because Corning Place proposed a hypothetical use, it must show that such use rests on a 'reasonable probability' rather than 'mere possibility.'" (quoting *United States ex rel. TVA v. 1.72 Acres of Land*, 821 F.3d 742, 752 (6th Cir. 2016))). "Determining the [property's] highest and best use necessitate[s] a look at market demand . . . ." *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 998 n.12.[14]

If different from the current use, a proposed highest and best use requires both "closeness in time" and "reasonable probability." *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985); *see also Ranch Springs*, 164 T.C., slip op. at 34; *Savannah Shoals*, T.C. Memo. 2024-35, at \*37. Any proposed uses that "depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable" are to be excluded from consideration. *Olson*, 292 U.S. at 257; *see also Corning Place Ohio, LLC v. Commissioner*, 2025 WL 3089710, at \*4 ("In making this assessment, the owner's estimates of the value of any conservation easement must be grounded in economic

---

[14] The highest and best use inquiry is often described in reference to whether a proposed use is (1) legally permissible, (2) physically possible, (3) financially feasible, and (4) maximally productive. *See, e.g.*, *Ranch Springs*, 164 T.C., slip op. at 41; *Buckelew Farm*, T.C. Memo. 2024-52, at \*52. As Roger Ball, the Commissioner's valuation expert, observed, the existence of market demand ties directly to the financial feasibility of a proposed use.

[*34] realities, not pies in the sky."); *Excelsior Aggregates*, T.C. Memo. 2024-60, at *30; *Oconee Landing*, T.C. Memo. 2024-25, at *65.

Our inquiry thus entails "an objective assessment of how immediate or remote the likelihood is that the property, absent the [conservation] restriction, would in fact be developed." Treas. Reg. § 1.170A-14(h)(3)(ii). "Where, as here, the parties proposed different uses, we consider '[i]f there is too high a chance that the property will not achieve the proposed use in the near future,' in which case 'the use is too risky to qualify.'" *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000). "The principle can also be articulated in terms of willingness to pay. If a proposed use is too risky for 'a hypothetical willing buyer [to] consider [the use] in deciding how much to pay for the property,' then the use should not be deemed the highest and best available." *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000 n.14 (quoting *Whitehouse II*, 615 F.3d at 335).

As we have recently noted, the Supreme Court's decision in *Olson* shows how the analysis works. *Paul-Adams Quarry Tr.*, T.C. Memo. 2025-112, at *42; *see also Stanley Works*, 87 T.C. at 401. The Supreme Court in *Olson* considered a property owner's argument "that his property, if joined with several adjacent properties, could have been used for construction of a power plant, and that the fair market value of damages to the property as a result of the easements the government obtained should reflect that potential use of the property." *Stanley Works*, 87 T.C. at 401. The Supreme Court disagreed, concluding that there was no reasonable probability in the reasonably foreseeable future that the property would be used for construction of a power plant, even though the property was suitable for it. *Id.* The Supreme Court specifically cautioned:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.

*Olson*, 292 U.S. at 257.

**[*35]**      2.    *Analysis*

Partners contends that the highest and best use of the easement property before the granting of the easement was a "lakeside residential development." Although Mr. Greene's original appraisal had imagined such a community of 308 mostly off-water lots and very limited amenities, Partners washed its hands of this work by the time of trial. Partners now turns for support to Charles Hewlett, whom we recognized as an expert in real estate market analysis. Mr. Hewlett performed a retrospective market analysis, concluding that "there would have been an attractive market opportunity at the date in question for the development of a well-executed, lake-oriented residential master-planned community targeted to a mix of second/vacation, pre-retirement, and retirement buyers."[15]

Mr. Maxwell relied on this market demand analysis to draft an updated site plan that showed a 157-lot lakeside residential development, which included 13 lakefront lots, 17 lots that fronted Town Creek, 29 lake view lots, and 98 interior/open space lots. The development also contemplated a few more amenities than in his 2017 plans, including a pool, a clubhouse, pickleball courts, some boat slips, a boardwalk, and green space. Gregory Eidson, whom we recognized as an expert for Partners in real estate appraising, leaned on Mr. Hewlett's analysis, as well as Mr. Maxwell's site plan, in preparing an appraisal of the easement property.

For his part, the Commissioner determined that "the highest and best use . . . before granting the conservation easement was mixed use, with low-density residential development on the waterfront, and recreational use for the interior acreage." The Commissioner relied on Mr. Ball, the Chairman of the Alabama Real Estate Appraisers Board and former president of the Alabama chapter of the Appraisal Institute, whom we recognized as an expert in real estate appraisal and appraisal of conservation easements. Mr. Ball concluded that there was no market demand for a residential subdivision in the part of Elmore County where Lake Jordan was located, much less one with a heavy concentration of interior lots.

---

[15] At trial the Commissioner moved for reconsideration of his earlier motion to exclude Mr. Hewlett's report (and testimony), arguing that Mr. Hewlett's report failed the testability requirement recognized in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Any shortcomings go to weight rather than admissibility, and we accordingly will deny the Commissioner's motion to reconsider.

**[\*36]** The record before us weighs convincingly in favor of the Commissioner's view of highest and best use. We agree with Mr. Ball's conclusion that there was no market demand for a lakeside residential development of the sort dreamed up by Partners and its experts. As Mr. Ball explained in his report and at trial, the easement property is situated in a hard-to-access part of a very rural Alabama county with little development. The easement property is located a considerable distance from any commercial conveniences (including a gas station), one of the reasons Mr. Greene determined that an active adult community was not feasible on the property. And as local market participants confirmed to Mr. Ball, the Titus area had seen very little development whatsoever. Specifically, "[t]here are no single-family residential subdivisions in this part of Elmore County," much less a lakeside residential development with a large dose of interior lots, which purportedly would draw vacationers and pensioners from across Alabama and beyond to the shores of Lake Jordan.

Moreover, neither Mr. Barrett nor Ms. Zak's team apparently factored in the purported lakeside development when agreeing on a purchase price for the 165 acres. Mr. Barrett, a sophisticated and veteran participant in the local real estate market, set his price at $583,000. In doing so, he (1) began with a value of $2,200 per acre for the 165 acres, which he felt to be "what the property was worth," (2) added a $25,000 surcharge for each of the 11 lakefront lots that he had marked, and (3) subtracted $55,000, to account for the cost to build a dirt road to each of the 11 lots. The real-world evidence that a savvy businessman did not take a purportedly extremely lucrative potential use into account when setting a price is a strong indication that such a development was not the highest and best use. *Cf. Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000 n.14. This conclusion is buttressed by the conduct of Ms. Zak's team, which never seriously pursued development but focused on monetizing a conservation easement. *See Corning Place*, T.C. Memo. 2024-72, at \*38 ("The strongest evidence that the [development] was not 'reasonably probable' is that [the sponsors] never seriously considered this use. . . . From the outset, the [highest and best use the sponsors] single-mindedly pursued was conversion of the [property] into [a conservation easement] . . . ."); *see also Oconee Landing*, T.C. Memo. 2024-25, at \*40.

Messrs. Hewlett and Eidson nonetheless would have us believe that market demand exists for a lakeside residential development on the easement property, highlighting certain purported advantages including access to regional source markets, a large site area, lake

[*37] access, and planned amenities. These general characteristics do not make the easement property unique or meaningfully distinguish it from other lake properties in this part of Alabama. Thus, "if [a lakeside residential development] were a 'reasonable and probable use' of the [easement property], other properties' values would have reflected that reality in their sales prices." *Buckelew Farm, LLC v. Commissioner*, 2025 WL 2502669, at *7 (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 987). Partners' experts have introduced no price data that supports such demand.

The existence of similar properties (including some on Lake Jordan itself) further raises the question whether the development of the easement property into a lakeside residential community would be "needed or likely to be needed in the reasonably near future." *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 996 (internal quotation omitted). We see no reason why this unexceptional property would be likely to be developed rather than any other Alabama lake property, especially if such properties were being sold at a fraction of the price contemplated here. *See, e.g.*, *Corning Place Ohio, LLC v. Commissioner*, 2025 WL 3089710, at *5 ("[The evidence] show[s] 'no shortage of alternative development sites' that could meet market demand at a far lower cost."); *Buckelew Farm*, T.C. Memo. 2024-52, at *55; *Mill Road*, T.C. Memo. 2023-129, at *51 ("[I]n light of the high number of available properties just as suitable as the [property at issue], one cannot say that there was a high likelihood that the [property at issue] would have been developed . . . and one can say there was zero probability that it would have developed if the selling price had been $6.7 million or any other remotely similar price.").

While little commends the easement property for development, quite a lot cautions against it. It does not take Kallikrates or Frank Lloyd Wright to understand that the success of a development or a building is rooted in place. The easement property's lack of nearby commercial conveniences, its accessibility difficulties, and its challenging topography, combined with its river aesthetic and its distance from the main body of Lake Jordan, would push a developer to look for a similar location that might have fewer obstacles to surmount.

We further reject the attempt by Partners' experts to use Lake Martin, one of Alabama's top lakes, to conjure up a demand for a lakeside development on Lake Jordan. "[T]hat was to this[,] Hyperion to a satyr," William Shakespeare, *Hamlet* act 1, sc. 2, ll. 143–44, or as Mr. Eidson more prosaically acknowledged, "if someone is looking to

**[\*38]** purchase a lot around Lake Martin, they are probably not the same person who's looking for the lot around Lake Jordan."

As Mr. Ball observed, Lake Martin is the largest lake in Alabama, with approximately 750 miles of shoreline and "numerous coves and sloughs creat[ing] expansive views, islands, sandy beaches, and a pristine natural aesthetic." According to Mr. Ball, "Lake Martin has a tremendous impact on Alabama's economy and is an important recreational resource for people who reside in the local region and beyond." Lake Martin features high-end residential subdivisions, as well as 14 marinas offering fuel, boat sales, boat service, and sundry items, 10 restaurants located on or just off the lake (one of which was recognized by the James Beard Foundation), and multiple golf courses. Moreover, the primary subdivision developer, Russell Lands, has taken a "thoughtful" approach, "only releas[ing] a limited number of lots at any given time in its subdivisions," which "ensures there is a constant demand" and "has dramatically raised the value of properties."

This is a far cry from the easement property's location in the remote area of humble Lake Jordan, which has no commercial conveniences, no restaurants, and one marina that sells neither food nor ice. Messrs. Hewlett and Eidson do not much resist this conclusion but nonetheless contend that Lake Jordan could draw from "a somewhat more price-sensitive segment of the market" than Lake Martin. This admission and the plainly huge differences between the two lakes convince us that demand on Lake Martin is neither here nor there for demonstrating market demand on Lake Jordan. Given its unique position in the market, we think that Lake Martin illuminates demand no further than its own shores.[16]

We are likewise unconvinced of the market demand for a lakeside development with such a large proportion of interior lots. In his report Mr. Hewlett observed that there were "few relevant new or resale home sales, and none in lake-oriented master plans, in the Lake Jordan submarket against which to adequately judge the potential for a well-executed community at the [easement] property." Instead of taking the rather strong market hint, Messrs. Hewlett and Eidson (as well as Partners in its brief) extrapolate demand from the existence of developments with a much lower proportion of interior lots and from the

---

[16] To be clear our rejection of Lake Martin as a useful point of reference for estimating market demand extends to Mr. Hewlett's "capture rate analysis," which was based on Lake Martin data.

**[\*39]** sales of properties that are not on lakes at all. That a buyer might be willing to purchase an interior lot in a Lake Martin development or that there is a market for off-water properties does not persuade us that demand exists for a development on Lake Jordan where 127 out of the 157 lots have no water access.[17]

In summary, the development of the easement property into a lakeside residential community with modest amenities and large numbers of off-water lots was not a reasonably probable use before the granting of the easement. "'[T]here is too high a chance that the property will not achieve the proposed use in the near future,' in which case 'the use is too risky to qualify.'" *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1369 (quoting *Palmer Ranch Holdings Ltd. v. Commissioner*, 812 F.3d at 1000). We instead agree with Mr. Ball that the highest and best use is the easement property's current use, i.e., low-density residential development on the waterfront, and recreational use for the interior acreage.

### C. *"Before" Valuation of the Easement Property*

Having settled the easement property's highest and best use before the granting of the easement, we proceed to determine "a dollar value based on that use." *TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1370; *see also Buckelew Farm, LLC v. Commissioner*, 2025 WL 2502669, at \*8. We typically refer to one or more of three common approaches to determine the fair market value of a piece of real property: (1) the market, or comparable sales, approach; (2) the income approach; and (3) the cost, or an asset-based, approach. *See, e.g.*, *Ranch Springs*,

---

[17] We have significant misgivings about Mr. Hewlett's demand conclusions. Mr. Hewlett relies on nationwide surveys indicating that (1) 80% of potential vacation-home buyers saw 2017 as a good time to buy and (2) half of respondents to a survey conducted by Mr. Hewlett's company felt that market conditions were moderately or significantly improving that year. These surveys tell us very little, as did survey results indicating interest in the South (43% of respondents to Mr. Hewlett's company's survey) and properties on lakes (21%). Nor are we persuaded by the fact that the easement property lies within 200 miles of assorted metropolitan centers including Montgomery, Birmingham, Atlanta, Chattanooga, and Pensacola (among other cities listed). In determining that there would be demand for 30 lot sales annually over six years (a pace far outstripping any development on Lake Martin), Mr. Hewlett fails to grasp that the extremely general survey results that he puts forth as indicative of demand for a lakeside development equally support a development on nearly any other lake from Chattanooga, Tenneessee to Pensacola, Florida and from Atlanta, Georgia, to Mobile, Alabama. His analysis fails to explain why existing stock is not sufficient to absorb this demand and why a development on this particular out-of-the-way lake would capture buyers against so many equally (or better) positioned competitors.

**[\*40]** 164 T.C., slip op. at 40; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*32; *see also Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded on another issue sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). Our decision on which approach (or approaches) to use is a question of law, and the utility of the various approaches can vary based on the type of property at issue. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013); *see also Corning Place*, T.C. Memo. 2024-72, at \*31–32; *Savannah Shoals*, T.C. Memo. 2024-35, at \*35–36.

"This Court has repeatedly affirmed that actual arm's-length sales occurring sufficiently close to the valuation date are the best evidence of value, and typically dispositive, over other valuation methods." *Buckelew Farm*, T.C. Memo. 2024-52, at \*56; *see also J L Mins.*, T.C. Memo. 2024-93, at \*55; *Corning Place*, T.C. Memo. 2024-72, at \*28; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*31 ("The best evidence of a property's [fair market value] is the price at which it changed hands in an arm's-length transaction reasonably close in time to the valuation date."); *ES NPA Holding, LLC v. Commissioner*, T.C. Memo. 2023-55, at \*14. Both we and the Eleventh Circuit have "f[ou]nd the purchase [of a partnership interest] reflective of the price that the market would pay for the Subject Property, especially when the ownership interest was nearly 100% and the only asset held by the Partnership was the Subject Property itself." *Buckelew Farm*, T.C. Memo. 2024-52, at \*56; *see also TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1368, 1371 n.23 (finding that the sale price for a 98.99% interest in a partnership whose only meaningful asset was property on which an easement was granted shortly thereafter was representative of the "before" value of the property); *Oconee Landing*, T.C. Memo. 2024-25, at \*71–72.[18]

---

[18] We pause to make two additional observations. First, the degree to which the purchase of an interest in a partnership whose sole asset is a piece of property reflects the fair market value of the property varies by situation. Where the value of the partnership interest stems from a previous arm's-length transaction involving the property, the partnership interest would have considerable probative value. This would not be the case where the value of the partnership interest is derived from a capital raise that contemplates paying for extensive services in addition to funding the acquisition of the interest in the entity holding the relevant property. Second, we note that our general discussion of the sale price of partnership interests is not meant to preclude the possibility of a valuation discount in appropriate circumstances. Partners does not argue that we should factor any valuation discount into our calculations and thus has waived it. *See, e.g.*, *Giambrone v. Commissioner*, T.C. Memo. 2024-47, at \*19.

**[\*41]** The various approaches and the value indicated by previous sales provide a valuable sanity check for each other. *See Ranch Springs*, 164 T.C., slip op. at 40; *Excelsior Aggregates*, T.C. Memo. 2024-60, at \*32. Both parties here rely on the comparable sales approach to value the conservation easement. Partners also relies on the income approach, while the Commissioner points to historical sales of the easement property itself and of other properties near Lake Jordan.

1.     *Comparable Sales Approach*

a.     *Legal Framework*

The comparable sales approach "values property by comparing it to similar properties sold in arm's-length transactions around the valuation date." *Savannah Shoals*, T.C. Memo. 2024-35, at \*36; *accord Ranch Springs*, 164 T.C., slip op. at 48. This method is usually the most reliable indicator of value when sufficient information exists about sales of properties resembling the subject property. *See, e.g.*, *United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979) ("Courts have consistently recognized that, in general, comparable sales constitute the best evidence of market value."); *see also Mountain Valley Pipeline, LLC v. 9.89 Acres of Land*, 127 F.4th 437, 441 (4th Cir. 2025) ("Comparable sales are generally accepted as the best evidence of property value." (citing *United States v. 269 Acres, More or Less*, 995 F.3d 152, 164 (4th Cir. 2021))); *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("In land condemnation proceedings, the comparable sales method of valuation is the preferred approach of establishing the fair market value of property."); *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 896 (7th Cir. 1985) ("Generally, evidence of sales of comparable property is persuasive evidence of market value, either as direct proof or in support of an expert's opinion." (quoting *United States v. 1,129.75 Acres of Land*, 473 F.2d 996, 998 (8th Cir. 1973))); *Whitehouse Hotel Ltd. P'ship v. Commissioner* (*Whitehouse III*), 139 T.C. 304, 324–25 (2012) (stating that other valuation methodologies are "not favored if comparable-sales data are available"), *aff'd in part, vacated in part, and remanded*, 755 F.3d 236 (5th Cir. 2014).

"The comparable sales method is based on the 'principle of substitution.'" *Ranch Springs*, 164 T.C., slip op. at 48. That principle stands for the proposition that "the value of a property can be estimated at the cost of acquiring an equally desirable substitute." *Mill Road*, T.C. Memo. 2023-129, at \*51; *see also Buckelew Farm, LLC v. Commissioner*, 2025 WL 2502669, at \*7 ("[T]here is little reason to think a willing buyer

**[*42]** would have paid $32,600 per acre for the Property [at issue]. After all, a buyer could simply purchase substitute properties for exponentially less: per-acre prices ranging from $1,602 to $4,971."); *Buckelew Farm*, T.C. Memo. 2024-52, at *29 ("[T]he principle of substitution . . . stands for the proposition that a hypothetical buyer will not pay more for a given property when an alternative property is available for less."); *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119 ("[A] prudent man will pay no more for a given property than he would for a similar property."), *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision).

"Because no two properties are ever identical, the appraiser must adjust the sale prices of the comparables to account for differences between the properties (e.g., parcel size, location, and physical features) and the terms of the sales (e.g., proximity to valuation date and conditions of sale)." *Savannah Shoals*, T.C. Memo. 2024-35, at *36 (citing *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979)); *see also J L Mins.*, T.C. Memo. 2024-93, at *58. The reliability of a comparable sales analysis depends on the comparability of the properties selected as comparables and the reasonableness of the adjustments made to the prices to establish comparability. *Wolfsen Land & Cattle Co.*, 72 T.C. at 19–20.

"In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation . . . .'" *Oconee Landing*, T.C. Memo. 2024-25, at *67 (quoting *Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987)). "[T]he market place is the best indicator of value, based on the conflicting interests of many buyers and sellers." *Estate of Spruill*, 88 T.C. at 1229 n.24 (quoting *Estate of Rabe*, 34 T.C.M. (CCH) at 119).

b.      *Analysis*

In their reports, the parties' experts select purported comparable properties consistent with their respective views of the easement property's highest and best use before the granting of the easement.

We begin by rejecting Mr. Eidson's comparable sales analysis, which depends exclusively on adjustments to sales of three properties on Lake Martin. As we have explained (and Messrs. Eidson and Hewlett acknowledged), Lake Martin is vastly different from Lake Jordan and appeals to a wholly distinct market segment. We have no confidence that Mr. Eidson, or any appraiser, could make sufficient qualitative and

**[*43]** quantitative adjustments to bridge the gap between one of the top destinations in Alabama and a place that could be most charitably described as rural. This is not the first time that Mr. Eidson has selected questionable comparable properties, and once again we have a sneaking suspicion that his "approach . . . [is] directed at generating a high valuation for the [easement] property rather than performing an accurate appraisal." *Seabrook*, T.C. Memo. 2025-6, at *51.

For his part, Mr. Ball "surveyed the sales activity of other waterfront acreage in the subject's competitive market area" focusing on sales of waterfront acreage tracts on lakes that, like Lake Jordan, are part of the Coosa River chain in Central Alabama.[19] His report explicitly rejected sales on Lake Martin, which he determined "not . . . to be comparable to Lake Jordan." Mr. Ball observed that there were a limited number of waterfront acreage transactions in Alabama because the business model of Alabama Power, the primary landowner of this waterfront acreage, did not emphasize such sales. Given the relative paucity of comparable transactions, Mr. Ball also included a supplemental sales comparison analysis of six waterfront acreage sales

---

[19] At trial Partners objected to Mr. Ball's report on the grounds that it failed to satisfy Rule 702 of the Federal Rules of Evidence, which provides that a witness qualified as an expert may testify only if four conditions are met: (1) the expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. *See also Daubert*, 509 U.S. 579. "[A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Id.* at 593. Partners asserts that Mr. Ball's report fails this testability requirement by failing to specify lakes searched, methodology used to pull the sales, or strategy for selecting comparable properties. Mr. Ball's report (as further illuminated by his testimony) provides sufficient information on these points to survive the testability challenge, and Partners' criticisms go to the weight that we should accord his professional judgment. Partners further argues for the exclusion of Mr. Ball's report because it fails to comply with Treasury Regulation § 1.170A-14(h)(3)(i), which provides that the fair market value "of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor . . . is the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction." Although Partners correctly notes that Mr. Ball failed to value eight acres owned by Holdings that were not covered by the easement, it fails to explain the harm from this error. Indeed, it would seem that these eight acres would be more valuable after the granting of the easement considering that the surrounding area would be protected in perpetuity from development. In any event, we see no grounds for exclusion and will admit Exhibit 5801-R.

[*44] (and one listing) that occurred after the date of the donation, which he saw as confirming his original analysis.

The five pre-donation sales in Mr. Ball's primary analysis included one sale on Lake Jordan and four sales on Lay Lake. The Lake Jordan sale, which took place in 2007, involved a property of 40.18 acres and resulted in a sale price of $350,000 ($8,711 per acre). The four Lay Lake sales involved properties ranging from 27.4 to 42.0 acres and occurred between 2012 and 2015. These transactions resulted in sale prices between $145,000 and $545,000, which produced a per-acre value range of $4,405 to $15,228.

Mr. Ball then adjusted the various sale prices to account for differences between the easement property and the comparables. Specifically, he made upward adjustments to account for the specific time/market conditions of each sale. Mr. Ball then made downward adjustments on the basis of size and feet of water frontage per acre, consistent with his views that "[s]maller land parcels typically sell for more per unit than larger parcels," and "[a]s the amount of water frontage per acre increases, the number of potential waterfront lots also increases." Mr. Ball also made downward adjustments on prices of three of the five properties to reflect more favorable topography, deeming the other two equivalent to the easement property. He made significant upward adjustments to the Lay Lake property prices reflecting their locations on a slough or narrow parts of that lake (which produced limited views). Finally, Mr. Ball made some upward and some downward adjustments based on the locations of the properties with respect to highways, towns, and conveniences.

After making the adjustments, Mr. Ball concluded that the "before value" of the easement property was approximately $7,000 per acre, which resulted in a fair market value in rounded numbers of $1,110,000. The most similar property according to the physical adjustments was the Lake Jordan property sold in 2007, which had sold for $350,000 and had an adjusted price per acre of $9,651.

As noted, Mr. Ball also conducted a supplemental analysis of six sales from Lake Jordan and Lay Lake between 2018 and 2022, as well as one listing from Lake Mitchell in 2023. Excluding the listing, the adjusted values of these sales averaged $7,965 per acre. Three of the six sales took place on Lake Jordan from 2020 through 2022, with an adjusted per-acre average of $7,908. One of these Lake Jordan sales

**[\*45]** involved the same property as in the primary analysis, with the property selling for $350,000 in 2007 and $375,000 in 2022.

Partners critiques multiple aspects of Mr. Ball's valuation. First, it asserts Mr. Ball improperly considered post-donation sales in his supplemental analysis. "In general, while, all else being equal, sales occurring within a reasonable time before the valuation date might be preferable, sales occurring within a reasonable time after the valuation date may be used so long as the relevant market conditions have not materially changed." *Paul-Adams Quarry Tr.*, T.C. Memo. 2025-112, at \*82; *see also Trout Ranch, LLC v. Commissioner*, 493 F. App'x 944, 952 (10th Cir. 2012) ("While evidence of subsequent sales may not always be probative of a prior fair market value, whether such evidence should factor into an appraisal is not a categorical question of law but a simple question of relevance: Does unfair prejudice substantially outweigh the probative value of the evidence?"), *aff'g* T.C. Memo. 2010-283; *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1044 (11th Cir. 1988) ("There is no absolute rule which precludes consideration of subsequent sales. The general rule is that evidence . . . of all [similar sales in the vicinity made at or about the same time] should generally be admissible . . . including subsequent sales." (quoting *United States v. 320.0 Acres of Land*, 605 F.2d at 799)); *First Nat'l Bank of Kenosha*, 763 F.2d at 894. Here, Partners' own expert, Mr. Hewlett, asserts in his report that, given "the relatively modest pace with which this market has evolved from a real estate perspective, it is reasonable to assume that [his Q1 2023] observations apply equally to the subject property in Q4 2017." Crediting Mr. Hewlett's view of the market as relatively static, we see no error in considering post-donation sales in this area to the extent that such sales are otherwise relevant.

Turning to the principal comparative analysis, Partners argues that Mr. Ball improperly considered a November 2007 sale on Lake Jordan, given the market disruptions that followed the Great Recession. Of course 2007 represented the high-water mark for property values for many a year, which would redound to Partners' benefit, not detriment. Moreover, Mr. Ball appropriately applied a healthy time/market conditions adjustment to account for the time gap, which resulted in an adjusted price per acre of $9,651. If anything, this view was extremely generous to Partners' position—the same property was sold 15 years later (in 2022) for only $25,000 more, which resulted in a much lower adjusted price per acre of $6,803.

[*46] Partners finally contends that Mr. Ball improperly drew on Lay Lake for comparable sales. Partners points out that Lay Lake was generally a less attractive recreational lake (unless one enjoyed bass fishing), with more tree stumps, shallower water, and the specter of pollution. Although Lay Lake offers a significantly better comparable than Lake Martin, we nonetheless conclude that our analysis should focus on Lake Jordan sales.

As we have previously explained, Mr. Ball's primary and supplemental analyses considered four Lake Jordan sales, which occurred in 2007, 2020, 2021, and 2022. Mr. Ball's adjustments produced an average adjusted price per acre of $8,344, i.e., ($9,651 + $6,803 + $ 6,600 + $10,322)/4 = $8,344. We therefore conclude that the before value of the property is $1,376,760 ($8,344 × 165 = $1,376,760).

### 2. *Income Approach*

#### a. *Principles*

The income method values a property by computing the present value of projected future income from the property. *Chapman Glen Ltd.*, 140 T.C. at 327; *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd*, 921 F.2d 280 (9th Cir. 1991) (unpublished table decision); *see also J L Mins.*, T.C. Memo. 2024-93, at *60; *Excelsior Aggregates*, T.C. Memo. 2024-60, at *33; *Savannah Shoals*, T.C. Memo. 2024-35, at *36. "The theory behind an income approach is that an investor would be willing to pay no more than the present value of a property's anticipated future net income." *Savannah Shoals*, T.C. Memo. 2024-35, at *36 (citing *Trout Ranch*, T.C. Memo. 2010-283); *see also Excelsior Aggregates*, T.C. Memo. 2024-60, at *33.

"The income capitalization [approach] is most reliable when used to determine the value of an existing business with a track record of income, expenses, profits, and growth rates. A historical track record provides real-world inputs that supply a plausible basis for projecting future revenue." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *43–44 (citing *Whitehouse III*, 139 T.C. at 325 (noting that the income approach "has been judged an unsatisfactory valuation method for property that does not have a track record of earnings")); *see also J L Mins.*, T.C. Memo. 2024-93, at *61.

"The income approach is rarely appropriate when seeking to determine the value of raw land or other undeveloped property with no existing cashflow." *Ranch Springs*, 164 T.C., slip op. at 55; *see*

[*47] *Savannah Shoals*, T.C. Memo. 2024-35, at *36 ("Income valuation methods are not favored when valuing vacant land with no income-producing history because they are inherently speculative and unreliable."); *see also Whitehouse III*, 139 T.C. at 324–25; *Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 243–44 (1968), *aff'd per curiam*, 406 F.2d 288 (2d Cir. 1969); *Excelsior Aggregates*, T.C. Memo. 2024-60, at *33. "We have often noted 'the folly of trying to estimate the value of undeveloped property by looking to its anticipated earnings.'" *Ranch Springs*, 164 T.C., slip op. at 56 (quoting *Pittsburgh Terminal Corp. v. Commissioner*, 60 T.C. 80, 89 (1973), *aff'd*, 500 F.2d 1400 (3d Cir. 1974) (unpublished table decision)); *see also Chapman Glen, Ltd.*, 140 T.C. at 327; *Whitehouse III*, 139 T.C. at 324–25; *Ambassador Apartments*, 50 T.C. at 243–44; *Savannah Shoals*, T.C. Memo. 2024-35, at *36. "Absent a financial track record, every input into the [discounted cashflow] analysis necessarily involves speculation." *Excelsior Aggregates*, T.C. Memo. 2024-60, at *44; *see also Winooski Hydroelec. Co. v. Five Acres of Land*, 769 F.2d 79, 82 (2d Cir. 1985) ("On the most basic level, the future income calculations were too speculative, since Green Mountain had not operated any business at Montpelier # 4 for over a decade."); *Corning Place*, T.C. Memo. 2024-72, at *37 ("Lacking reliable data, the appraiser would have to rely on a lengthy series of assumptions, estimates, and guesstimates."). Accordingly, "[w]hile the use of the income method . . . is not *a priori* unacceptable for any valuation purpose," it is appropriate to reject it in a particular case if we find it "prone to error and based on too many unverifiable assumptions." *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 755 F.3d at 246–47.

"When the income approach is used, the Court must examine the plausibility of the critical assumptions made by the appraiser." *Ranch Springs*, 164 T.C., slip op. at 55 (citing *Kiva Dunes Conservation, LLC v. Commissioner*, T.C. Memo. 2009-145, 97 T.C.M. (CCH) 1818, 1820). "Each assumption, whether large or small, carries with it 'some risk of error.'" *Id.* (quoting *Whitehouse III*, 139 T.C. at 323). "As interdependent assumptions multiply, the risk of error can increase exponentially." *Id.*; *see also J L Mins.*, T.C. Memo. 2024-93, at *62.

b. *Analysis*

Mr. Ball did not use the income approach "because the property is vacant land and properties of this type and location are typically not purchased based on income generation." Mr. Eidson took a different tack, relying on the Maxwell site plan and Mr. Hewlett's market research to prepare a discounted cashflow analysis (a species of income

[*48] approach). Based on Mr. Maxwell's plan of a lakeside residential community of 157 lots and certain amenities on the easement property, Mr. Eidson estimated the total cost of developing the property at approximately $4.1 million. Mr. Eidson then set prices for each of the four types of lots contemplated in Mr. Maxwell's plan, relying on his own research as well as Mr. Hewlett's analysis. According to Mr. Eidson, the gross retail value pursuant to Mr. Maxwell's plan was approximately $19 million over the term of the development. Based on Mr. Hewlett's plan, he anticipated that the lots would sell out over a nine-year period, with sales starting in the first year. Mr. Eidson estimated marketing costs of about $1.2 million, bringing total costs to $5.3 million. Taking into account selling costs and applying a discount rate of 16%, Mr. Eidson calculated a residual value of approximately $7.4 million, which he equated to the fair market value of the easement property.

We reject Partners' discounted cashflow analysis for several reasons. As an initial matter, Mr. Eidson's work is premised on the assumption that development of the easement property into a lakeside residential community was its highest and best use. We have rejected that assumption, however, rendering the analysis a nonstarter.

Moreover, we have serious reservations about Mr. Eidson's decision to equate the value of a potential development on the property with the value of the easement property itself. If this were the case, we would expect "other properties' values would have reflected that reality in their sales prices." *Buckelew Farm, LLC v. Commissioner*, 2025 WL 2502669, at *7; *accord TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1370–71. This insight is consistent with the principle of substitution, i.e., that "a prudent man will pay no more for a given property than he would for a similar property." *Mill Road*, T.C. Memo. 2023-129, at *51 n.30 (quoting *Estate of Rabe*, 34 T.C.M. (CCH) at 119). It also comports with the U.S. Court of Appeals for the Seventh Circuit's observation that "even a 'small' number of [rival landowners with property equally suitable for development] allows the developer to capture the returns" by "chisel[ing] the price down." *Van Zelst v. Commissioner*, 100 F.3d 1259, 1263 (7th Cir. 1996), *aff'g* T.C. Memo. 1995-396.

Given undisputed testimony from the Chief Appraiser for Elmore County that in 2017 large tracts of undeveloped land around Lake Jordan were available for $2,500–4,000 per acre, with increased prices for waterfront property depending on the frontage and view, we cannot conclude that the net present value of the development is the same as

[*49] the fair market value of the land that houses the purported development. Here the "discounted cashflow method is not valuing the property at all, but what a speculative business could do with the property," which is "of limited utility in determining what a property is worth." *J L Mins.*, T.C. Memo. 2024-93, at *63; *see also Seabrook*, T.C. Memo. 2025-6, at *66–67.

"[E]ven assuming that the income method can be usefully applied to vacant land with quality inputs, . . . a [discounted cashflow] analysis loses its utility when such inputs are lacking." *Seabrook*, T.C. Memo. 2025-6, at *66–67; *see also Ranch Springs*, 164 T.C., slip op. at 55. We see numerous questionable assumptions, each of which skews the discounted cashflow analysis towards a higher value.

i.     *Site Plan*

We first question the 157-lot layout contemplated by Mr. Maxwell and embraced by Mr. Eidson. Relying on Mr. Hewlett's market analysis, Mr. Maxwell designed a site plan that featured 81% of the lots having no lake access with over 60% of the lots designated as low-priced interior lots with nary as much as an advertised lake view. Mr. Eidson testified that he was unaware of any lakeside residential community with such a high proportion of interior lots. For his part, Mr. Ball explained that off-water lots in two of the Lake Martin developments analyzed by Mr. Eidson were used to address sewer and septic issues presented by waterfront soil, while a third had no off-water lots. We thus struggle to adopt Mr. Eidson's certitude as to the demand for this type of development.

Mr. Eidson nonetheless contends that demand exists for interior lots because of the generalized desire to live in a master planned community. This is rank speculation. Mr. Eidson's few examples of interior lot sales in other communities either come from Lake Martin or involve developments with many fewer interior lots. As discussed previously, we will not climb out on this shaky conceptual limb.

Mr. Eidson's assumption regarding the desire to live in a master planned community further points at an unresolved tension that runs through his analysis. Specifically, Mr. Hewlett, on whom Mr. Eidson reportedly relies, ties demand, pricing, and absorption to an "attractive amenity package, including lakefront clubhouse and sales pavilion, pool, sports courts (e.g., tennis, pickleball, basketball, etc.), boat ramp access and small marina, controlled monument entry statement/gate and

[*50] rigorous covenants, and design standards to promote quality and consistency within the community that is lacking elsewhere in the competitive marketplace." Even crediting Mr. Hewlett's view that this amenity package would help drive interest in interior lots (and ignoring other drawbacks such as limited accessibility and lack of conveniences), this description is light years from Mr. Maxwell's stripped-down site plan. Were the site plan to embrace Mr. Hewlett's vision, the development costs would increase as seen in Mr. Newson's original 2017 cost estimate and thereby lower the value spit out by the discounted cashflow analysis. Mr. Eidson simply waves away the very real tension between demand and costs.

ii.   *Lot Prices*

We also have doubts about the prices that Mr. Eidson assigned to each of the four lot types contemplated in Mr. Maxwell's site plan:

| Product | Lot Price | LTV | Home Price |
|---|---|---|---|
| Lake Front | $205,000 | 35% | $585,714 |
| Harbor/Town Creek | 185,000 | 33% | 560,606 |
| Lake View | 145,000 | 32% | 453,125 |
| Interior/Open Spaces | 75,000 | 30% | 250,000 |

Mr. Eidson based these prices on his review of Lake Jordan waterfront and interior lot sales as well as on data from Mr. Hewlett. "As a check on the pricing," he also looked to waterfront and interior home sales that he adjusted using a sliding lot-to-value ratio "typical . . . in the marketplace."

Mr. Eidson's lot prices are considerably higher than the Lake Jordan data supplied in his report. Between 2015 and 2017 the range of average waterfront lot prices was $96,222–135,100. The range of average interior lot prices was between $0 (as there were no sales at all in 2017) and $30,000. Mr. Eidson again asserts that his significant upcharge for lakefront ($205,000) and interior ($75,000) lots was justified by the possibility of being "in a planned community, which I think has benefits over just a lot on the lake." As we have explained, we

[*51] see no support for this assertion as it applies to the imaginary Lake Jordan development.

Our conclusion on this point is confirmed, rather than swayed, by Lake Jordan home sales. Again, Mr. Eidson assumes that prices for homes will be considerably higher because of the surrounding master planned community with limited amenities, a view we reject. He also uses a high lot-to-value ratio consistent with "amenity rich or resort type of settings" such as Lake Martin. Using the same lot-to-value ratio for a new development as that of the premier lake destination in Alabama, together with inexplicably inflated home prices, strikes us as an attempt to goose the numbers rather than to set realistic lot prices.

### iii. *Discount Rate*

We end by noting our lack of confidence in Mr. Eidson's chosen discount rate. Although he notes average Q4 2017 pro forma rates, i.e., those reflecting forward-looking revenue and expenses, of 20.57% for this area, Mr. Eidson picks a much lower rate of 16%. He reasons that this lower rate is justified "given the assumption of absorption and the fact that the proposed lots are located in a planned development and on a lake that has no immediate competition." As we do not share Mr. Eidson's rosy (and unsupported) outlook, we believe his discount rate is significantly understated.

### iv. *Conclusion*

Our observations on these points are not meant to catalog all the flaws in Mr. Eidson's discounted cashflow analysis. Rather, this brief stroll through Mr. Eidson's work simply highlights the problem with an income method analysis untethered from a historic track record; it can be used to combine speculation and unreliability to generate a baseless value.

### 3. *Transactions Involving the Easement Property*

In late November 2017, just one month before the donation of the conservation easement, Mr. Barrett contributed the easement property to Holdings. On December 29, 2017, Partners paid a total of $583,000 to the Barretts (or on their behalf) for a 96% interest in Holdings. After taking into account the 96% interest, this sale price equaled $3,681 per acre (($583,000/165)/.96 = $3,681). We find this value relevant and consistent with past holdings of both the Eleventh Circuit and our

[*52] Court. *See, e.g., TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th at 1371; *Seabrook*, T.C. Memo. 2025-6, at *67.

Partners asserts, however, that Mr. Barrett's sale should be considered a distressed sale given the pressure on him to pay off a family debt. Assuming arguendo that Mr. Barrett cashed out early because of the family dynamics, Mr. Barrett's understanding of the market nonetheless refutes the outlandish valuations offered by Messrs. Greene and Eidson. Mr. Barrett, the local bank president who had accumulated more than $3 million in real estate holdings, credibly testified that he could have sold the property for $700,000 if he had had more time. Mr. Barrett's best-case scenario thus is a small fraction of Mr. Greene's fabulous value of $12,740,000 or even Mr. Eidson's somewhat more modest value of $7.4 million.

Nor do we believe that the December 2017 transaction counted as a distressed sale. As we have recently explained, "[p]eople often sell assets to raise cash to satisfy their desires or meet their obligations," and "[s]elling an asset for such a purpose provides no evidence that the seller is under a 'compulsion to sell.'" *Ranch Spring*, 164 T.C., slip op. at 36. "Distress sales commonly occur when sellers are forced to sell *when they do not want to sell*, e.g., because market conditions are highly adverse or because they would incur a large loss." *Id.*

Partners has supplied no evidence that the real estate market around Lake Jordan was distressed at yearend 2017. Although Mr. Barrett had been given a 30-day demand letter in December 2016 to pay off a debt to his deceased uncle, he found that the heirs "were willing . . . to wait on the time period." Mr. Barrett credibly testified that he deemed his asking price of $583,000 to be fair, and Mr. Thomas and Ms. Zak agreed to his terms. We see no indication that Mr. Barrett sold as part of a distressed sale and consider his asking price a good indication supporting the before value determined under the comparable sales approach.[20]

---

[20] If anything, the adjusted sale price of $607,292 ($583,000/.96) would support a value much lower than that derived from Mr. Ball's comparable Lake Jordan sales. Absent these sales, we likely would have settled on a value that more closely approximates what Mr. Barrett, a sophisticated market player, actually set as his asking price.

**[\*53]**  D.    *Valuation Conclusion*

The parties agree that we value the easement by calculating the difference between the fair market value of the easement property before and after Holdings granted the easement.  We have determined that the "before" value of the property was $1,376,760.  Given the parties' stipulation of an "after" value of $285,000, we conclude that the value of the conservation easement was $1,091,760.

IV.    *Penalties*

A.    *Civil Fraud Penalty*

1.    *Motion to Amend Pleadings*

At the end of the trial the Commissioner orally moved under Rule 41(b) to conform the pleadings to the evidence presented, asserting that Holdings is liable for the civil fraud penalty under section 6663(a). Whether to grant such a motion is a matter within the discretion of the Court.  *See, e.g., Estate of Quick v. Commissioner*, 110 T.C. 172, 178 (1998), *supplemented by* 110 T.C. 440 (1998); *Kamal v. Commissioner*, T.C. Memo. 2023-80, at \*25.  We must examine whether the opposing party would suffer unfair surprise or prejudice if a motion to amend were granted.  *See, e.g., Estate of Quick*, 110 T.C. at 178.

We first see no unfair surprise.  The Commissioner filed a motion to amend his pleadings under Rule 41(a) to add the civil fraud penalty two months before the date trial was originally set to begin.  Although we denied that motion, we expressly noted that "[i]f in the trial . . . new evidence were to come out that might support the Commissioner's fraud contention, then our current denial of his motion to file an amendment would not preclude him from seeking to conform the pleading to the evidence at trial."  Holdings was on notice of the issue.

Nor do we see prejudice.  After denying the Commissioner's motion to amend, we continued the original trial date for two months, giving Holdings a total of four months from the Commissioner's first assay to prepare for potential evidence and arguments on fraud.  The Commissioner bases his posttrial motion on testimony and documents provided by Ms. Zak and her team during the examination and while the parties were preparing for trial.  Holdings "cannot reasonably claim to be surprised."  *Kamal*, T.C. Memo. 2023-80, at \*25.

**[\*54]** We therefore will grant the Commissioner's oral motion and allow him to assert the civil fraud penalty against Holdings. We next must determine whether Holdings is liable for the penalty.

## 2. *Fraudulent Intent*

Section 6663(a) imposes a penalty "equal to 75 percent of the portion of the underpayment which is attributable to fraud." The Commissioner retains the burden of proof, however, "[i]n any proceeding involving the issue whether the [taxpayer] has been guilty of fraud with intent to evade tax." I.R.C. § 7454(a). "[T]hat burden of proof is to be carried by clear and convincing evidence," Rule 142(b), and the Commissioner "must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes," *Mill Road*, T.C. Memo. 2023-129, at \*57 (quoting *Parks v. Commissioner*, 94 T.C. 654, 661 (1990)).[21]

As we have explained, "[f]raud is intentional wrongdoing on the part of the taxpayer with the specific purpose of evading a tax believed to be owing." *Kamal*, T.C. Memo. 2023-80, at \*27; *accord Petzoldt v. Commissioner*, 92 T.C. 661, 698 (1989). "Fraud may not be found under 'circumstances which at the most create only suspicion.'" *Buckelew Farm*, T.C. Memo. 2024-52, at \*58 (quoting *Davis v. Commissioner*, 184 F.2d 86, 87 (10th Cir. 1950)). "[F]raud may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. . . . The intent to conceal or mislead may be inferred from a pattern of conduct." *Niedringhaus v. Commissioner*, 99 T.C. 202, 210–11 (1992); *see also Mill Road*, T.C. Memo. 2023-129, at \*57.

The Commissioner faces an uphill task in proving fraud here given that Holdings expressly disclosed on its tax return the principal facts about the easement donation as the Code and Treasury regulations mandate in their various substantiation and reporting requirements. *See Buckelew Farm*, T.C. Memo. 2024-52, at \*59–60; *Mill Road*, T.C. Memo. 2023-129, at \*59. "This is not a case in which the donor intentionally deprived the Commissioner of an essential tool needed for the 'efficient identification of overvalued property.'" *Buckelew Farm*, T.C. Memo. 2024-52, at \*59 (quoting *Belair Woods, LLC v.*

---

[21] Although the Commissioner bears the burden of proof with respect to the fraud penalty, "[t]he Commissioner does not bear the burden of production with respect to penalties in a partnership-level proceeding." *Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 236 (2018).

**[\*55]** *Commissioner*, T.C. Memo. 2018-159, at \*17); *see also Mill Road*, T.C. Memo. 2023-129, at \*58–59. Instead, this case presents an instance nearly identical to that in *Mill Road*:

> [Holdings] donated a conservation easement on property it owned and claimed a corresponding charitable contribution deduction; it attached all necessary information to its tax return as required by the Code and regulations, the purpose of which is to alert the Commissioner to potential overvaluations of charitable gifts; the Commissioner was accordingly alerted to the disparity between [Holdings'] basis in the [easement property] and the value of the conservation easement claimed as a deduction; he determined to examine [Holdings'] tax return; and an overvaluation of the charitable contribution has been determined.

*Mill Road*, T.C. Memo. 2023-129, at \*59; *see also Buckelew Farm*, T.C. Memo. 2024-52, at \*60. Holdings' compliance in its tax reporting—putting it straight in the Commissioner's crosshairs for examination—seems a poor fit with an intent to evade tax. *Mill Road*, T.C. Memo. 2023-129, at \*59; *see also Buckelew Farm*, T.C. Memo. 2024-52, at \*60.

The Commissioner attempts to resist the conclusion by pointing not to the traditional badges of fraud, *see, e.g.*, *Niedringhaus*, 99 T.C. at 211; *Mill Road*, T.C. Memo. 2023-129, at \*57–58, but to strong evidence that Ms. Zak and her associates were sophisticated businesspeople who knew well what they are doing, i.e., constructing a fanciful vehicle to exploit a perceived flaw in the Code and thus generating a lucrative return funded by the public fisc for giving away essentially nothing. He further notes that Ms. Zak and her team played fast-and-loose in service of this plan, backdating documents and generally engaging in low-grade dishonesty to complete the steps of the transaction in the limited time allotted. The Commissioner points to the fact that this was particularly pernicious given that the finances of the entire project required overvaluations and the complicity or willing blindness of professionals and organizations in whom a great deal of public trust ordinarily resides.

The Court shares the Commissioner's frustration with the mix of sophistry and cupidity at the heart of this transaction, as well as the utter waste of time and money spent in untangling the ins and outs of this abusive scheme. Fraud this was not, however. "The evidence does

**[\*56]** not establish an attempt by [Holdings] to conceal or deceive in the Commissioner's administration of tax collection . . . ." *Mill Road*, T.C. Memo. 2023-129, at \*64. It instead shows an attempt to gin up a laughably aggressive tax position that should have been rejected by anyone with the least shred of common sense. We accordingly conclude the fraud penalty does not apply. *See Buckelew Farm*, T.C. Memo. 2024-52, at \*60; *see also Mill Road*, T.C. Memo. 2023-129, at \*64.

B.     *Section 6662 Penalty*

In the alternative, the Commissioner argues that Holdings is liable for the accuracy-related penalties under section 6662(b)(1), (2), and (3). Each paragraph, respectively, imposes a penalty equal to 20% of the portion of an underpayment that is attributable to "[n]egligence or disregard of rules or regulations," "[a]ny substantial understatement of income tax," or "[a]ny substantial valuation misstatement." I.R.C. § 6662(a) and (b); *see also Buckelew Farm*, T.C. Memo. 2024-52, at \*60–61. A valuation misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the amount determined to be correct. I.R.C. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement," which occurs if the value of property claimed on the return exceeds 200% of the amount determined to be correct. I.R.C. § 6662(h). As an initial matter, we note that we previously granted the Commissioner's motion for partial summary judgment and found that he "established compliance with section 6751" as it relates to these penalties.

Typically, accuracy-related penalties provide for a "reasonable cause" defense if a taxpayer shows that it "acted in good faith with respect" to the underpayment. I.R.C. § 6664(c)(1). However, "in the case of a 'gross valuation misstatement' . . . there is no 'reasonable cause' defense available." *Mill Road*, T.C. Memo. 2023-129, at \*65; *see* I.R.C. § 6664(c)(3).

Holdings deducted $12,740,000 for the easement contribution on its return, and we have determined that the correct value of the easement on December 29, 2017, was $1,091,760. The claimed value exceeded the correct value by $11,648,240. The reported value of the conservation easement thus was 1,167% of its correct value, and Holdings is therefore liable for the "gross" valuation misstatement penalty under section 6662(h). *See Mill Road*, T.C. Memo. 2023-129, at \*68; *see also Oconee Landing*, T.C. Memo. 2024-25, at \*74–75. "The 40% penalty thus applies to the portion of [Holdings'] underpayment

**[\*57]** attributable to claiming a value for the easement in excess of" $1,091,760. *See Oconee Landing*, T.C. Memo. 2024-25, at \*75. We "need not address any potential reasonable cause defense," as it does not apply to this penalty. *Buckelew Farm*, T.C. Memo. 2024-52, at \*61; *see* I.R.C. § 6664(c)(3).[22]

V.     *Conclusion*

For Holdings' 2017 short tax year ending December 31, 2017, we find that it is entitled to a charitable contribution deduction under section 170 of $1,091,760 for its donation to Foothills Land Conservancy of a conservation easement over the easement property. We also find that Holdings is liable for the 40% gross valuation misstatement penalty under section 6662(h).

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[22] Only one section 6662 accuracy-related penalty may be imposed with respect to any given portion of an underpayment. Treas. Reg. § 1.6662-2(c). However, this Court has jurisdiction to readjust partnership items and the applicability of any penalty that relates to an adjustment to a partnership item. I.R.C. §§ 6221, 6226; *United States v. Woods*, 571 U.S. 31, 39–42 (2013). While there is thus no limitation on our authority to determine the applicability of more than one accuracy-related penalty at the partnership level, *Oconee Landing*, T.C. Memo. 2024-73, at \*3–4, we need not do so in this case because we find a 40% gross valuation misstatement penalty under section 6662(h) applies to the entirety of the adjustment sustained in this Opinion. We thus have not considered alternative 20% accuracy-related penalties in cases where a 40% penalty under section 6662(h) applies to the entirety of the sustained adjustment. *See, e.g.*, *Beaverdam Creek*, T.C. Memo. 2025-53, at \*15 n.16; *Seabrook*, T.C. Memo. 2025-6, at \*77 n.60. We will not address the alternative 20% accuracy-related penalties further.